Filed 11/20/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN/JANE ROE, | H043248 |
| Petitioner and Appellant, | (Santa Clara County Super. Ct. No. 1-15-CV-280191) |
| v. | |
| WOLFGANG HALBIG, | |
| Respondent and Appellant. | |

Wolfgang Halbig sued five "John Doe" defendants in Florida for defamation for comments made about him on websites and social media sites. To determine the identities of the posters of the allegedly defamatory statements, Halbig served a subpoena on Google requiring the production of documents and information revealing the identity of the person maintaining http://sandyhookanalysis.blogspot.com. Google, in turn, notified the account holder of the subpoena. That person, described here as John/Jane Roe, filed a petition to quash the subpoena (motion to quash) under Code of Civil Procedure section 1987.1[1] and requested fees and costs under section 1987.2, subdivision (c). After Roe filed the motion to quash but before the hearing, Halbig withdrew the subpoena. At the subsequent hearing, the trial court found that Roe was the "prevailing party" under section 1987.2, subdivision (c) and awarded attorney's fees and costs to Roe.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

On appeal, Halbig argues that the trial court committed error when it determined that Roe was the prevailing party because, by the date of the court's decision and fee award, the subpoena had already been withdrawn. Halbig further contends that the trial court abused its discretion in determining the amount of attorney's fees and costs. Roe also appeals the fee award, asserting that the trial court abused its discretion when it awarded less than Roe requested. We uphold the trial court's determination that Roe was the prevailing party under section 1987.2, subdivision (c). We agree with both parties, however, that the trial court erred in setting the amount of attorney's fees. We therefore reverse the fee and costs award and remand the case with directions.

## I. FACTS AND PROCEDURAL BACKGROUND

Halbig, a "school safety and security expert and consultant" living in Florida, began an independent investigation of the December 14, 2012, shooting at Sandy Hook Elementary School in Newtown, Connecticut. Halbig became concerned about what he viewed as "glaring anomalies" in the investigation of the events in Connecticut, and he established an organization called "Sandy Hook Justice."

In March 2014, Halbig set up a donation account for Sandy Hook Justice on the crowd-funding website GoFundMe "to raise funds to underwrite the investigation and discovery of facts relating to the Sandy Hook shooting." Halbig raised $31,202 from his GoFundMe campaign. In October 2014, GoFundMe told Halbig that, "[a]fter a careful investigation of the numerous complaints we've received about your campaign, we have determined that you will no longer be able to use GoFundMe." Halbig believed that GoFundMe had canceled his Sandy Hook Justice campaign because of a letter that GoFundMe had received from the "Sandy Hook Defense Group." After further investigation, Halbig discovered "defamatory posts" about himself on a number of websites and social media sites.

On January 28, 2015, Halbig filed a complaint in the circuit court in Seminole County, Florida, asserting causes of action for defamation, tortious interference with

2

prospective business relationships, and civil conspiracy to commit defamation. The complaint named five defendants, who were described as "Doe" defendants because their "identities, locations, and residences [were] unknown to [Halbig] because the John Doe Defendants have intentionally hidden their identities to evade detection." The complaint specified four blogs and social media accounts that contained "false, derogatory, hurtful, and defamatory statements" about Halbig. Halbig sought unspecified damages and injunctive relief.

On February 5, 2015, the Florida circuit court issued an order granting Halbig leave to serve third-party subpoenas to determine the Doe defendants' identities. On April 29, 2015, Halbig issued a subpoena duces tecum under the authority of the Florida circuit court for third-party "Google Inc. (a/k/a 'Blogspot')." In the subpoena, Halbig sought, among other items, "[a]ny and all documents and information revealing the identity of the person(s) who established and maintain: http://sandyhookanalysis.blogspot.com/" (the website).[2]

On May 5, 2015, pursuant to section 2029.300[3] and the Florida subpoena, Halbig applied for and received from the Santa Clara County Superior Court a subpoena to Google to be served in Mountain View, California, for the production of business records "revealing the identity of the person(s) who established and maintain: http://sandyhookanalysis.blogspot.com/." On May 25, 2015, Google notified John/Jane Roe[4] (petitioner below and an appellant here), whose Google account was the subject of

---

[2] This website was not referenced in the Florida complaint, and it is not clear whether Roe is one of the Doe defendants.

[3] Section 2029.300 provides that, when a party submits an application using the appropriate Judicial Council form and a copy of the "foreign subpoena" and pays the required fee, "the clerk shall promptly issue a subpoena for service upon the person to which the foreign subpoena is directed." By its text, the section does not require any involvement by a California judicial officer.

[4] For simplicity, we will use the description "Roe" and masculine pronouns to refer to John/Jane Roe.

Halbig's subpoena. Google informed Roe that it would comply with the subpoena unless Roe provided it with "a file-stamped motion to quash the subpoena (or other formal objection filed in court)" by June 14, 2015. Roe hired counsel in California and, pursuant to section 1987.1, filed a motion to quash the subpoena in Santa Clara County Superior Court (the trial court) on June 11, 2015.

In his motion to quash, Roe argued that the trial court should quash the subpoena because Halbig could not establish a prima facie case under Florida law, as required by *Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1172 (*Krinsky*). Roe further sought reasonable costs and attorney's fees pursuant to section 1987.2, subdivision (c). Roe requested $21,874 in attorney's fees and $700 in costs.[5] Roe calendared the motion to be heard on July 9, 2015. Based on that hearing date, Halbig's opposition would have been due on June 25, 2015.

On June 30, 2015, Halbig's counsel in Florida emailed Roe's counsel and stated that Halbig was willing to withdraw the subpoena "upon the stipulation that all parties . . . bear their own costs and fees." Roe declined the offer.

On July 2, 2015, Halbig filed a "Request for Dismissal" in the trial court requesting that the Google subpoena be dismissed "[w]ithout prejudice." That same day, the clerk of the trial court signed the dismissal order. On July 6, 2015, three days before the hearing on the motion to quash, Halbig's Florida counsel emailed Roe's attorney the request for dismissal of the subpoena; asked that Roe cancel the hearing in the trial court; and stated that, if Roe did not cancel the hearing and Halbig "is forced to hire a California attorney . . . he will be forced to seek fees." Roe's counsel replied with an email and a subsequent letter refusing to cancel the hearing; noting that the subpoena "attempted to seek the identity of our client in what appears to be a suit involving the exercise of free

---

[5] Roe requested fees for attorney James Wagoner for 22 hours at $275/hour; attorney Leif Knutson for 8.7 hours at $240/hour; attorney Graham Van Leuven for 67.80 hours at $200/hour; and paralegal Lisa Landen for 1.6 hours at $110/hour.

4

speech"; and stating that Roe had incurred "attorney fees and costs" and was entitled to those fees and costs under section 1987.2, subdivision (c). To address the effect of Halbig's withdrawal of the subpoena, Roe filed additional briefing on July 7, 2015, arguing his motion was not moot and reiterating his request for attorney's fees and costs. In the July 7 filing, Roe requested $28,521 in attorney's fees and $799 in costs.[6]

Apparently in response to a request by Halbig, on July 9, 2015, the trial court continued the hearing on Roe's motion to quash and request for fees to August 9, 2015. On July 29, 2015, Halbig filed an opposition to the motion to quash in which he argued that the motion was mooted by his withdrawal of the subpoena; section 1987.2, subdivision (c) did not authorize an award of fees to Roe because Roe was not the "prevailing party"; and Roe's fee request was "patently exorbitant" and insufficiently detailed. Halbig did not address whether he had made a prima facie showing of a cause of action in the Florida case. Halbig also sought sanctions under section 1987.2, subdivision (a) in the amount of $3,650 for "costs and expenses" from Roe's refusal to withdraw his motion to quash.[7]

On August 4, 2015, Roe filed a reply, arguing that Halbig's voluntary dismissal of the subpoena without prejudice did not moot his request for fees; reiterating that Roe was the prevailing party under section 1987.2 subdivision (c); and stating that the requested fees were reasonable. Roe included a declaration by counsel providing a detailed description of the attorney's fees incurred. Roe requested a total of $42,581 in attorney's fees and $1,207.64 in costs.[8]

---

[6] Roe requested fees for attorney James Wagoner for 27.7 hours at $275/hour; attorney Leif Knutson for 8.7 hours at $240/hour; attorney Graham Van Leuven for 93.2 hours at $200/hour; and paralegal Lisa Landen for 1.6 hours at $110/hour.

[7] Halbig requested fees for attorney Nicholas Ranallo for 10.6 hours at $250/hour plus $1,000 for court appearances.

[8] Roe requested fees for attorney James Wagoner for 47 hours at $275/hour; attorney Leif Knutson for 8.7 hours at $240/hour; attorney Graham Van Leuven for 136.3 hours at $200/hour; and paralegal Lisa Landen for 2.8 hours at $110/hour.

5

On August 11, 2015, the trial court heard Roe's motion to quash and request for fees and costs, as well as Halbig's request for sanctions. Both Roe and Halbig were represented by counsel. After the court observed that Halbig had made no effort to establish a prima facie showing of a valid cause of action under Florida law, Halbig's counsel replied that he could not speak to that issue "because the withdrawal [of the subpoena] was actually before I was retained." He continued, "[T]he thought was rather than having a semi-defamation case here followed by one there, that if we can withdraw the subpoena and avoid now two court hearings, that would be far preferable for, you know, the out of state party who wasn't at the time even represented in California."

Turning to the amount of fees, the trial court told Roe's counsel, "I was somewhat stunned at the amount of fees you're seeking. Before filing the motion you incurred over $21,000 in attorney's fees . . . . And then since the last hearing on July 9th . . . it's now at $42,000. It's almost doubled since the first filing of the motion, even after the [subpoena was] dismissed." Roe's attorney cited the complexity of the legal research involved, including the need to research Florida law, First Amendment law, the legislative history of section 1987.2, and the need for additional research once Halbig had withdrawn the subpoena. Roe's counsel further noted that Halbig was seeking sanctions from Roe. The court replied, "[T]o be clear, I'm denying those." The court also observed that "I'm not sure that efforts to look at the legislative history [were] terribly helpful to me . . . ."

Addressing Roe's request for attorney's fees, Halbig's attorney objected that Roe did not provide detailed information about attorney's fees until the reply brief and that "to me [it] would be their burden [to do so] in the initial filing and not in a reply." He added, "And I mean, beyond that we can quibble about individual entries and that kind of thing, but I don't think you're interested in doing that." The court replied, "Not particularly. Wrap up very quickly." Roe's counsel again emphasized the complexity of the legal research and argued that his counsel's rates were "very reasonable, and . . . there's

6

basically no law on this, and this is a very important case to our client because if his or her identity's unmasked [that] could change things significantly."

At the conclusion of the hearing, the trial court made several findings. The court found that Roe was the prevailing party and that Halbig "did not establish a prima facie case of a valid claim." With respect to Roe's requests for costs, the court stated the filing fees were "recoverable" but photocopy and legal runner fees were not. In addition, the court denied travel expenses because "you could have appeared [telephonically]." "[L]ooking at what are recoverable costs under this [section] I'm not going to award travel expenses. So whatever's left after taking out the copies, court runner fees and travel expenses, I'll award those as costs."

With respect to the request for attorney's fees, the trial court stated, "I don't think that you can recover paralegal costs under the guise of attorney's fees." Turning to the hours billed by the attorneys working on Roe's behalf, the court observed, "In some cases when you have a junior attorney work on things, not to be disrespectful to you or anything, but as a billing attorney myself in the past, I would often write down the amount of time that a newer attorney spent on a case. And certainly the newer lawyer on the team spent by far the most hours." The trial court continued, "So in looking at this I think a reasonable amount to award as attorney's fees is more on the order of $22,000. I think the [$]42,000 was a lot, extreme in [the] setting [of] this case . . . . I think a petition to quash a subpoena should not require that amount of time. So I'm going to award [$]22,000 in fees and costs as I've indicated, reducing it for those items I'm not going to allow." The trial court told counsel for Roe, "I'm going to ask you to prepare an order and put some findings [on] the statute and the amount of fees I'm awarding."

On October 9, 2015, the trial court issued a written order and judgment setting out the rulings the court had made at the August 11 hearing. The order listed, among other findings, "The underlying action arises from John/Jane Roe's exercise of free speech rights on the Internet and Plaintiff has failed to make a prima facie showing of a cause of

7

action against John/Jane Roe," and "John/Jane Roe has prevailed through the voluntary dismissal of the subpoena without prejudice by Plaintiff and the failure of Plaintiff to establish a prima facie showing of a cause of action. John/Jane Roe should therefore be awarded reasonable expenses incurred in making this petition, including reasonable attorney fees."

With respect to the amount of fees awarded, the order stated that the rates charged by counsel were reasonable but "some of the time spent by counsel in this matter could have been avoided." In particular, the court deducted the following items from the requested attorney's fees: time spent on research into legislative history; "some of the time spent by [the junior attorney]"; time spent researching in preparation of the opposition; time for travel and live appearances; and the time spent by paralegals. The order also deducted costs for photocopying, runners, and travel expenses. "Accordingly, the Court approves the fee award pursuant to C.C.P. § 1987.2(c) and awards John/Jane Roe attorney's fees in the amount of $22,000 and costs in the amount of $495 for a total award of $22,495." The order denied Halbig's application for attorney's fees and costs.

Halbig timely appealed, challenging the trial court's legal conclusion that Roe was a prevailing party within the meaning of section 1987.2, subdivision (c). Halbig also argues that the trial court abused its discretion when it determined the amount of fees and costs to award. Roe has filed a cross-appeal, arguing that the trial court abused its discretion in setting fees and costs.

## II. DISCUSSION

### A. *Roe's Entitlement to Fees and Costs*

This case requires us to decide, for the purposes of awarding fees and costs under section 1987.2, subdivision (c), whether a moving party can "prevail[]" on a motion to quash or modify a subpoena if the subpoena has been withdrawn prior to a judicial ruling on the motion. Halbig contends that the trial court erred when it determined that Roe qualified as the prevailing party under the statute, which entitled Roe to attorney's fees

8

and costs. Halbig argues that, because he voluntarily withdrew the subpoena before the hearing on the motion to quash, Roe's motion was moot, and a party cannot "prevail" on a moot question. Relying primarily on cases interpreting California's anti-SLAPP statute,[9] Roe counters that Halbig's withdrawal of the subpoena meant that Roe had succeeded in his litigation objective and had therefore prevailed on his motion to quash, entitling him to attorney's fees and costs.

### 1. Standard of Review

The parties disagree on the appropriate standard of review. Halbig argues this court should review de novo the trial court's decision that Roe was the prevailing party, while Roe maintains that abuse of discretion constitutes the appropriate standard. "[I]t is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.) Here, there are no facts in dispute. The parties ask us to decide the meaning of "prevails" in section 1987.2, subdivision (c)—a question not answered by previous case law and that "involves the interpretation of a statute, a question of law that we review de novo." (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.) Therefore, we apply de novo review to the trial court's determination that Roe was the prevailing party.

### 2. Prevailing Party Under Section 1987.2, Subdivision (c)

"In construing a statute, a court's objective is to ascertain and effectuate legislative intent." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871.) "To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent." (*Ibid*.) "When the statutory language is itself ambiguous, we must examine the context in which the language appears, adopting the

---

[9] "SLAPP" stands for "strategic lawsuit against public participation." (*S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 377; see discussion at II.A.2.c., *post*.)

9

construction that best harmonizes the statute internally and with related statutes."
(*Wohlgemuth v. Caterpillar Inc.* (2012) 207 Cal.App.4th 1252, 1261.) " 'When the language is susceptible of more than one reasonable interpretation . . . we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Ibid.*) Further, "similar statutes should be construed in light of one another." (*People v. Tran* (2015) 61 Cal.4th 1160, 1168 (*Tran*).) " ' "[W]hen statutes are *in pari materia* similar phrases appearing in each should be given like meanings.' " [Citation.] " 'Two "[s]tatutes are considered to be *in pari materia* when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object." ' " (*Ibid.*)

a. *Statutory Language of Section 1987.2, Subdivision (c)*

Consistent with these principles of statutory interpretation, we begin our review of the trial court's determination that Roe was the prevailing party with the language of the relevant statute. Section 1987.2, subdivision (c) provides: "If a motion is filed under Section 1987.1 for an order to quash or modify a subpoena from a court of this state for personally identifying information, as defined in subdivision (b) of Section 1798.79.8 of the Civil Code, for use in an action pending in another state, territory, or district of the United States, or in a foreign nation, and that subpoena has been served on any Internet service provider, or on the provider of any other interactive computer service, as defined in Section 230(f)(2) of Title 47 of the United States Code, if the moving party prevails, and if the underlying action arises from the moving party's exercise of free speech rights on the Internet and the respondent has failed to make a prima facie showing of a cause of action, the court shall award the amount of the reasonable expenses incurred in making the motion, including reasonable attorney's fees." Thus, section 1987.2, subdivision (c) requires a trial court to award reasonable expenses to an individual who "prevails" on a motion to quash a subpoena for personally identifying information pursuant to section

10

1987.1, if the underlying action arose from the individual's exercise of free speech on the Internet, and if the respondent fails to make a prima facie showing of a cause of action. (§ 1987.2, subd. (c).)

Section 1987.2, subdivision (c) does not define "prevails." Nor does the statute specify what effect the voluntary dismissal of a subpoena should have on the determination of whether the movant "prevail[ed]" on his or her motion to quash. (§ 1987.2, subd. (c); see *Coltrain v. Shewalter* (1998) 66 Cal.App.4th 94, 102 (*Coltrain*) ["The vast majority of attorney's fee statutes do not explicitly provide for the event of a voluntary dismissal"].)

Many attorney fee statutes employ the concept of a "prevailing party." (See *Heather Farms Homeowners Assn. v. Robinson* (1994) 21 Cal.App.4th 1568, 1573-1574.) Courts interpreting fee statutes that refer to a party who "prevails" instead of a "prevailing party" use the terms interchangeably. (See, e.g., *Belth v. Garamendi* (1991) 232 Cal.App.3d 896, 901.)

California law does not offer a settled definition of the phrase "prevailing party," particularly in the context of a voluntary dismissal prior to a judicial determination. The California Supreme Court has observed, "As used in California statutes, the term [prevailing party] has more than one technical meaning. For purposes of the cost statutes, the term 'prevailing party' includes a party in whose favor a judgment of dismissal has been entered. (Code Civ. Proc., § 1032, subd. (a)(4).) Under subdivision (b)(2) of Civil Code section 1717, however, there is no prevailing party when the action has been voluntarily dismissed." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 609.)

To determine whether Roe qualifies as a "prevailing party" notwithstanding Halbig's withdrawal of the subpoena prior to the trial court's resolution of the motion to quash, Halbig urges us to rely on foundational legal principles and, in particular, on the doctrine of mootness. Halbig points us to cases that recognize that withdrawal of a subpoena can render a motion to quash moot. (See, e.g., *Lee v. Swansboro Country*

11

*Property Owners Assn.* (2007) 151 Cal.App.4th 575, 580; *Application of Caldwell* (N.D.Cal. 1970) 311 F.Supp. 358, 361.) Halbig argues as a matter of logic that Roe could not prevail on a moot question. Roe counters that, because section 1987.2, subdivision (c) protects free speech, this court should apply the definition of "prevailing party" developed in cases interpreting section 425.16, commonly known as the anti-SLAPP statute. This definition, Roe argues, focuses on "which party realized its objectives in the litigation." (*Kyle v. Carmon* (1999) 71 Cal.App.4th 901, 918.) Roe notes that this standard also appears in cases interpreting fee provisions in other statutes. (See *Almanor Lakeside Villas Owners Assn. v. Carson* (2016) 246 Cal.App.4th 761, 773 (*Almanor*).)

Both Halbig's and Roe's interpretations of "prevailing party" are plausible interpretations of the language of section 1987.2, subdivision (c). In the face of " 'more than one reasonable interpretation,' " we look to " 'a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*S.B. Beach Properties v. Berti* (2006) 39 Cal.4th 374, 379 (*Berti*).)

b. *Legislative History of Section 1987.2, Subdivision (c)*

The provision that is now codified as section 1987.2, subdivision (c) was first proposed in 2008 in Assembly Bill No. 2433 (the Bill). In its first iteration, the Bill proposed a modification of the anti-SLAPP statute (§ 425.16) to clarify that the term " 'cause of action' includes a subpoena or request for a subpoena from a court of this state for use in an action pending in another state . . . ." (Assem. Bill No. 2433 (2007-2008 Reg. Sess.) as introduced Feb. 21, 2008.)[10] As set out in more detail below, the

---

[10] The initial iterations of the Bill can be found online at: <http://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200720080AB2433> [as of November 20, 2018], archived at: <https://perma.cc/T77M-8Q35>.

object of the anti-SLAPP statute is "to protect citizens in the exercise of their First Amendment constitutional rights of free speech and petition.  It is California's response to the problems created by meritless lawsuits brought to harass those who have exercised these rights." (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 644, disapproved on another ground in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.)[11]

For reasons unexplained in the legislative history, in its next version the Bill had been amended to propose a modification of section 1987.2, a statute relating to discovery, instead of the anti-SLAPP statute.  Nevertheless, the Bill retained its focus on the free-speech concerns that animate the anti-SLAPP statute.  A report accompanying the revised Bill to the Assembly Committee on the Judiciary, for example, included a lengthy section

---

[11] In 2008, the same year the Bill was proposed, this court held that the anti-SLAPP statute, and its corresponding award of attorney's fees, did not extend to a motion to quash a subpoena because motions to quash are not "causes of action." (*Tendler v. www.jewishsurvivors.blogspot.com* (2008) 164 Cal.App.4th 802, 809 (*Tendler*).) Concurring in the result, Justice McAdams wrote, "Attention anonymous Internet posters and bloggers: this court has good news and bad news for those of you who engage in nontortious discourse.  The good news, announced earlier this year: your message will be protected by the First Amendment and your identity will be protected by the court quashing a third-party subpoena, unless the requesting party can make a prima facie showing of defamation.  [Citation.]  The bad news: it may cost you tens of thousands of dollars to preserve your anonymity." (*Id.* at p. 810 (conc. opn. of McAdams, J.).)  He concluded, "I urge the Legislature to consider whether section 425.16 as currently written adequately addresses this rapidly expanding arena of public expression . . . ." (*Id.* at p. 813 (conc. opn. of McAdams, J.).)

The legislative history of the Bill does not indicate a clear relationship to the *Tendler* decision.  *Tendler* was published in June 2008, and the Bill was first introduced in February 2008.  (Assem. Bill No. 2433 (2007-2008 Reg. Sess.) as introduced Feb. 21, 2008.)  However, the stated need for the Bill references a 2003 case, *First Cash Financial Services, Inc. v. John Doe* (Super. Ct. Santa Clara County, 2003, No. CV 002135), in which the Santa Clara County Superior Court found, as would this court in *Tendler*, that "the anti-Slapp law cannot be invoked to challenge . . . a subpoena, even if the underlying foreign lawsuit is a meritless SLAPP." (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 2433 (2007-2008 Reg. Sess.) as amended Apr. 17, 2008, p. 4.)  The current anti-SLAPP statute does not make any reference to subpoenas.  (§ 425.16.)

setting out the author's rationale for the Bill: " 'Current law does not address threats to speech that result from out-of-state actions that lead to burdensome discovery in California which may in itself cause a chilling effect on speech. For example, when the speaker publishes anonymously online, a plaintiff in an out-of-state case may request a subpoena in a California court to require a California-based Internet Service Provider . . . to divulge the identity of the speaker.' " (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2433 (2007-2008 Reg. Sess.) as amended Apr. 2, 2008, p. 2.) The report explained, " 'AB 2433 will expand the existing motion to quash statute to allow a moving party to quash a subpoena issued by [a] California court arising from litigation filed outside of California, when the subpoena is issued to attain personally identifying information.' " (*Ibid.*) " '[T]he provision will allow those whose records or other information are being sought, and subpoenaed witnesses, including online service providers, to recover their costs and attorneys' fees in resisting abusive subpoenas, and will create a disincentive for seeking such subpoenas in California in the first place.' " (*Ibid.*)

As it moved from the Assembly through the Senate, the Bill's legislative history continued to reflect a strong link to the Anti-SLAPP statute and a concern for the financial burdens of litigating the validity of subpoenas targeted at anonymous speakers. A report to the Senate Judiciary Committee included a section describing the "need for the bill": " 'The primary mechanism that can currently be used to challenge [subpoenas for out-of-state cases], a motion to quash, is not as effective as an anti-SLAPP motion. While the anti-SLAPP law has a prevailing defendant attorney fee provision, the filer of a motion to quash can only recover his or her attorney's fees if the court finds that the motion was opposed in bad faith or without substantial justification . . . . This makes it difficult for speakers who cannot afford to pay attorney's fees to find a lawyer to represent them in challenging an abusive subpoena.' " (Sen. Com. on Judiciary, Rep. on Assem. Bill No. 2433 (2007-2008 Reg. Sess.), as amended Apr. 17, 2008, p. 4.) The

14

report added that Assembly Bill No. 2433 "seeks to remedy this problem . . . by amending the [Code of Civil Procedure] to provide that such moving parties who prevail on a motion to quash or modify a subpoena are entitled to receive their reasonable attorney's fees." (*Ibid.*)

The final amendments to the Bill, added in the Senate, highlight the link between the Bill and the First Amendment and "clarify that the persons who may seek the motion [to quash] are those in connection with an underlying action involving their exercise of free speech rights, and clarify that a prevailing party may not recover expenses incurred unless the underlying action arose from the moving party's exercise of free speech rights on the Internet and the responding party has failed to make a prima facie showing in support of the cause asserted." (Assem. Com. on Judiciary, Conc. in Sen. Amends., Assem. Bill No. 2433 (2007-2008 Reg. Sess.) as amended Aug. 14, 2008, p. 1.) The current language of section 1987.2, subdivision (c) remains the same as that originally enacted by Assembly Bill No. 2433.[12]

As these representative excerpts illustrate, the legislative history of section 1987.2, subdivision (c) highlights the Legislature's focus on the burden on free speech posed by subpoenas derived from out-of-state cases targeting anonymous speakers on the Internet; the Legislature's concern with the costs of litigating cases threatening free speech; and the Legislature's intent to protect the exercise of free speech on the Internet. The anti-SLAPP statute reflects similar considerations.

---

[12] Section 1987.2, subdivision (c) was originally enacted into law as section 1987.2, subdivision (b). In 2012, it was moved, without alteration of its text, from section 1987.2, subdivision (b) to section 1987.2, subdivision (c). (2 Witkin, Cal. Evidence (2018 supp.) Discovery: Resisting Subpoenas, § 229, p. 173.)

c. *Section 1987.2, Subdivision (c) and the Anti-SLAPP Statute*

The anti-SLAPP statute, originally enacted in 1992, begins with a statement of legislative purpose: "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a); see also Burke, Anti-SLAPP Litigation (The Rutter Group 2018) 1:1.)

The anti-SLAPP statute creates a special motion to strike any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue . . . unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Moreover, a "defendant who is the 'prevailing [party] on' such a motion is 'entitled to recover his or her attorney's fees and costs.' (§ 425.16, subd. (c).)" (*Berti, supra,* 39 Cal.4th at p. 377.)

As excerpted above, section 1987.2, subdivision (c) contains a similar provision that requires the court to award reasonable attorney's fees and costs to a prevailing moving party. "[I]f the moving party prevails, and if the underlying action arises from the moving party's exercise of free speech rights on the Internet and the respondent has failed to make a prima facie showing of a cause of action, the court *shall award* the amount of the reasonable expenses incurred in making the motion, including reasonable attorney's fees." (§ 1987.2, subd. (c), italics added.) At least one commentator has observed the similarities between this provision and the anti-SLAPP statute. (Burke, Anti-SLAPP Litigation, *supra*, 2:19 [describing section 1987.2, subdivision (c), as "anti-SLAPP-like protection"].)

16

Because of the close link between the objective of the anti-SLAPP statute and the public policy animating section 1987.2, subdivision (c), we conclude that the statutes are *in pari materia*, and that " ' "similar phrases appearing in each should be given like meanings." ' " (*Tran*, *supra*, 61 Cal.4th at p. 1168.)  Moreover, "[w]hen legislation has been judicially construed and subsequent statutes on a similar subject use identical or substantially similar language, the usual presumption is that the Legislature intended the same construction, unless a contrary intent clearly appears." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135 (*Ketchum*).)  We therefore apply the construction of "prevailing party" as it has been developed in case law interpreting the anti-SLAPP statute to the similar concept found in section 1987.2, subdivision (c) and, in particular, to determine the effect of a voluntary withdrawal of a subpoena on prevailing party status.

Courts of Appeal have uniformly held that a defendant may qualify as the "prevailing party" under the anti-SLAPP statute even where the SLAPP suit has been voluntarily dismissed prior to a judicial ruling on the anti-SLAPP motion to strike.  (See, e.g., *Moore v. Liu* (1999) 69 Cal.App.4th 745, 751 (*Liu*); *Tourgeman v. Nelson & Kennard* (2014) 222 Cal.App.4th 1447, 1456 (*Tourgeman*).)  Describing the justification for the award of attorney's fees notwithstanding the prior dismissal of the complaint, courts have reasoned that, if a plaintiff is able to avoid paying attorney's fees "by the device of dismissing the SLAPP prior to a hearing on the defendant's motion to strike," such a result "deprives [defendant] of the monetary relief which the Legislature intended to give her, while at the same time it relieves [plaintiffs] of the punishment which section 425.16 imposes on persons who use the courts to chill others' exercise of their constitutional rights." (*Liu, supra,* at pp. 747-748.)  The legislative history of section 1987.2, subdivision (c), echoes a similar theme, stating the attorney's fee provision of the statute " 'will allow those whose records or other information are being sought, and subpoenaed witnesses, including online service providers, to recover their costs and attorneys' fees in resisting abusive subpoenas, and will create a disincentive for seeking

17

such subpoenas in California in the first place.' " (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2433 (2007-2008 Reg. Sess.), as amended Apr. 2, 2008, p. 2.)

Therefore, given the similar purpose of the anti-SLAPP statute and section 1987.2, subdivision (c) and based upon case law interpreting the anti-SLAPP statute, we conclude that, "[i]f a motion [to quash a subpoena] is filed under Section 1987.1," "the moving party" can "prevail[]" under section 1987.2, subdivision (c) even if the respondent has dismissed the subpoena prior to judicial determination of the motion to quash. (§ 1987.2, subd. (c).) The trial court correctly rejected Halbig's argument that Roe's motion to quash became moot when Halbig voluntarily dismissed the subpoena.

d. *Roe Was the Prevailing Party Under Section 1987.2, Subdivision (c)*

That Roe's motion to quash was not mooted by Halbig's dismissal of the subpoena does not resolve the question whether the trial court properly determined that Roe had "prevail[ed]" on the motion to quash within the meaning of section 1987.2, subdivision (c). To answer this question, we again consult the case law developed in the analogous context of the anti-SLAPP statute. (See *Ketchum*, *supra*, 24 Cal.4th at p. 1135.) We are also mindful of the " 'cardinal principle of appellate review' " that " '[a] judgment or order of the lower court is presumed correct[, and a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*In re Julian R.* (2009) 47 Cal.4th 487, 498-499 (*Julian R.*), italics omitted.)

Although the Courts of Appeal agree that the dismissal of a SLAPP suit prior to judicial determination of the merits of a motion to strike does not preclude a court from finding that the movant prevailed, they have taken two approaches to determining prevailing party status in these circumstances. At least one court has defined the prevailing party under section 425.16 as the "party [that] realized its objectives in the litigation." (*Coltrain, supra,* 66 Cal.App.4th at p. 107.) Under this rubric, a plaintiff's voluntary dismissal of the complaint prior to a ruling on the anti-SLAPP motion to strike

18

creates a rebuttable presumption that the defendant who filed the motion to strike is the prevailing party.  (*Ibid*.)

In contrast, a majority of the Courts of Appeal require that the trial court determine the merits of the anti-SLAPP motion to strike notwithstanding the prior dismissal of the underlying suit.  If the motion to strike would have been granted absent the dismissal of the complaint, then the court is required to award attorney's fees and costs for the motion to strike.  (See *Liu*, *supra*, 69 Cal.App.4th at p. 751 [holding that "a defendant who is voluntarily dismissed, without or without prejudice, after filing a section 425.16 motion to strike, is nevertheless entitled to have the merits of such motion heard as a predicate to a determination of the defendant's motion for attorney's fees and costs"]; *Pfeiffer Venice Properties v. Bernard* (2002) 101 Cal.App.4th 211, 215, 217-218 [holding "the trial court has jurisdiction to award attorney fees to a prevailing defendant whose [anti-]SLAPP motion was not heard solely because the matter was dismissed before defendants obtained a ruling on the [anti-]SLAPP motion" and following the approach of *Liu* in requiring the trial court to rule on the merits of the anti-SLAPP motion as a precondition to awarding attorney's fees]; *Tourgeman*, *supra*, 222 Cal.App.4th at p. 1456 [noting "[n]umerous courts have agreed with the *Coltrain* court's conclusion that a trial court retains jurisdiction to award attorney fees pursuant to section 425.16, subdivision (c)(1), after a plaintiff voluntarily dismisses its complaint while a special motion to strike is pending" and agreeing with *Liu* that the trial court must first determine the merits of the motion to strike before awarding attorney's fees].)

To ascertain whether Roe prevailed within the meaning of section 1987.2, subdivision (c), we need not elect between these approaches because Halbig does not affirmatively establish that the trial court committed error when it found that Roe prevailed.  (See *Julian R*, *supra*, 47 Cal.4th at pp. 498-499.)  Halbig's withdrawal of the Google subpoena achieved Roe's litigation objective of retaining his anonymity, and Halbig does not contend that he withdrew the subpoena "for . . . reasons unrelated to the

19

probability of success on the merits." (*Coltrain*, *supra*, 66 Cal.App.4th at p. 107.) In addition, the trial court's determination that Halbig "failed to make a prima facie showing of a cause of action" necessarily means that Roe's motion to quash would have been granted absent Halbig's dismissal of the subpoena (see *Liu*, *supra*, 69 Cal.App.4th at p. 751; *Krinsky*, *supra*, 159 Cal.App.4th at p. 1172), and Halbig does not challenge that finding here.[13] At no point in this litigation has Halbig attempted to establish a prima facie showing of a valid cause of action in his underlying Florida case. Because Roe's motion to quash met all of the requirements of section 1987.2, subdivision (c), and in light of our conclusion that Roe's motion was not mooted by Halbig's withdrawal of the subpoena, we affirm the trial court's finding that Roe "prevail[ed]" under section 1987.2, subdivision (c) and, therefore, was entitled to "the amount of the reasonable expenses incurred in making the motion, including reasonable attorney's fees." (§ 1987.2, subd. (c).)

Before turning to the method by which the trial court calculated attorney's fees and costs, we briefly explain why we find unpersuasive Halbig's remaining arguments challenging the trial court's determination that Roe was the prevailing party. Halbig argues that *Evilsizor v. Sweeney* (2014) 230 Cal.App.4th 1304 (*Evilsizor*) is "the case most directly on point," involves "identical" behavior, and "holds that persisting in a motion to quash after the purportedly objectionable subpoena has been withdrawn is itself sanctionable behavior." In *Evilsizor,* the Court of Appeal upheld a trial court's decision to award sanctions in the form of attorney's fees under section 1987.2, subdivision (a) against an individual whose bank records had been mistakenly subpoenaed in the context

---

[13] Halbig also does not contest that "the underlying action [arose] from the moving party's exercise of free speech rights on the Internet" or that the "subpoena [was issued] from a court of this state for personally identifying information, as defined in subdivision (b) of Section 1798.79.8 of the Civil Code, for use in an action pending in another state . . . , and th[e] subpoena [was] served on any Internet service provider, or on the provider of any other interactive computer service . . . ." (§ 1987.2, subd. (c).)

of a contentious divorce proceeding and who refused to withdraw the motion to quash after the subpoena had been withdrawn. (*Id.* at pp. 1306, 1308, 1311.)

Far from finding *Evilsizor* directly on point, we conclude that the case is irrelevant to the interpretation of section 1987.2, subdivision (c). *Evilsizor* examines section 1987.2, subdivision (a). That provision states: *"Except as specified in subdivision (c)*, in making an order pursuant to motion made under subdivision (c) of Section 1987 or under Section 1987.1, the court may in its discretion award the amount of the reasonable expenses incurred in making or opposing the motion, including reasonable attorney's fees, if the court finds the motion was made or opposed in bad faith or without substantial justification or that one or more of the requirements of the subpoena was oppressive." (§ 1987.2, subd. (a), italics added.)

Critically, the text of subdivision (a) explicitly excludes subdivision (c), the provision at issue here. We agree with Halbig that *Evilsizor* stands for the proposition that, except for subpoenas in litigation involving the "exercise of free speech rights on the Internet" addressed by section 1987.2, subdivision (c), a refusal to withdraw a motion to quash after the original subpoena has been withdrawn can expose the filer of the motion to quash to sanctions (and, Halbig argues, a strong inference that the person sanctioned was not the prevailing party). But, as Halbig's subpoena falls squarely within the conduct that section 1987.2, subdivision (c) is designed to deter and punish, *Evilsizor* does not apply.

Halbig argues that, once he had withdrawn the subpoena, Roe had no reason to fear that Halbig's further efforts would unmask his identity, and he maintains that Roe's refusal to withdraw the motion to quash needlessly incurred extra costs—the behavior sanctioned by the court in *Evilsizor*. Halbig's argument, however, ignores the possibility that he could have sought another subpoena for Roe's identity. Halbig asked for and received a "dismissal" of the Google subpoena "without prejudice." The record contains no evidence that at the time of the hearing on the motion to quash Halbig had determined

21

the identity of the "Doe" defendants or dismissed the underlying lawsuit in Florida. As noted in the analogous anti-SLAPP context, "[t]he specter of the action being refiled (at least until the statute of limitations had run) would continue to have a significant chilling effect on the defendant's exercise of its First Amendment rights. At that point, the plaintiff would have accomplished all the wrongdoing that triggers the defendant's eligibility for attorney's fees, but the defendant would be cheated of redress." (*Coltrain*, *supra*, 66 Cal.App.4th at pp. 106-107.)

More generally, Halbig's arguments do not recognize that the conduct he admittedly engaged in (securing a subpoena from a California court in connection with meritless litigation from an out-of-state case targeted at unmasking an anonymous speaker on the Internet) is conduct that the Legislature specifically sought to punish and deter with section 1987.2, subdivision (c). The Legislature selected as the deterrence mechanism the attorney's fees Halbig now seeks to avoid.

Finally, Halbig contends that the only way the trial court could have determined that Roe were the prevailing party was if the trial court employed the "catalyst" theory of determining a successful party where there is no judicial resolution of litigation. The "catalyst theory" permits a court to award attorney fees under section 1021.5 " 'even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation.' " (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 247 (*Vasquez*).) The catalyst theory requires a party seeking attorney's fees to have reasonably attempted to settle the litigation before filing the lawsuit. (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 577.) Halbig contends that Roe was not entitled to prevail under the catalyst theory because Roe did not attempt settlement before filing the motion to quash.

The text of section 1987.2, subdivision (c) does not require any prelitigation notice by the person seeking to quash a subpoena for personally identifying information. (Cf. *Vasquez, supra,* 45 Cal.4th at p. 252 [observing "the Legislature clearly knows how to

22

require prelitigation demands unambiguously when that is what it wishes to do"].) And the catalyst theory's requirement of prelitigation notice seems particularly inapt in the context of section 1987.2, subdivision (c). The purpose of the prelitigation notice is to "discourage extortionate suits without putting a damper on lawsuits that genuinely provide a public benefit." (*Vasquez*, *supra*, at p. 255.) However, it was Halbig, not Roe, who filed the lawsuit targeted at speech that the trial court ultimately determined to lack a prima facie basis, and we have no reason to believe that the failure to make a "prelitigation demand" before filing a motion to quash (even assuming the concept applies when litigation has already been initiated by the other side) would encourage extortionate suits. We decline to import the requirements of the "catalyst theory" into section 1987.2, subdivision (c), and conclude that Roe's failure to make a prelitigation demand is irrelevant to the determination of prevailing party under the statute.

In summary, the trial court correctly determined that Roe "prevail[ed]" on the motion to quash notwithstanding Halbig's dismissal of the subpoena. (§ 1987.2, subd. (c).) The trial court's accurate determination that Roe was the prevailing party triggered the dictate of subdivision (c) that "the court shall award the amount of the reasonable expenses incurred in making the motion, including reasonable attorney's fees." (§ 1987.2, subd. (c).) We now turn to the trial court's calculation of the attorney's fees and costs to which Roe was entitled.

B. *The Trial Court's Calculation of Attorney's Fees and Costs*

Both parties appeal the trial court's award of attorney's fees and costs. Halbig argues that the trial court's determination of attorney's fees was procedurally flawed because the court considered information provided for the first time in Roe's reply brief, and the declaration supporting the attorney fee request was "rife with hearsay" that should not have been considered. Halbig also contends that, instead of using the lodestar method to calculate reasonable attorney's fees, the trial court arbitrarily picked the figure of $22,000.

Roe similarly argues that the trial court did not adequately justify its decision to reduce the fees and costs he requested. Roe contends that the trial court's decision not to award "the full fees and costs incurred by [him] to oppose [Halbig's] initial wrongful subpoena . . . will have a chilling impact on similarly situated litigants." Moreover, Roe maintains that the language of section 1987.2, subdivision (c) reflects a legislative intent that attorney's fees must be awarded as a matter of right, they must be "fully compensatory," and they may not be reduced "based on what the court thinks the category of litigation 'should not require.' " At oral argument, Roe pressed this point further, maintaining that the language of section 1987.2, subdivision (c) reflects a legislative determination that a trial court must award the full amount of fees and costs requested by the prevailing party as long as the hourly fees were themselves reasonable.

Roe also argues that the trial court erred when it ruled that paralegal expenses cannot be included in a fee award and when it refused to award attorney's fees incurred from his attorneys' travel from Fresno to the trial court in San Jose. Halbig agrees with Roe that the trial court should not have categorically excluded paralegal fees from the attorney fee award but believes the trial court had the authority to exclude travel costs in light of the California Rule of Court "favoring telephone appearances." Roe also requests fees and costs for the appeal, an issue Halbig does not address.

Turning first to Halbig's procedural points, we conclude that Halbig has waived any challenge to hearsay statements contained in the declaration accompanying the request for fees by failing to object on that basis below. (*Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 173 (*Gonzalez*).) Moreover, the trial court had discretion to consider the additional information provided in Roe's reply brief. (See *Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1308.) Halbig's own opposition to the motion to quash complained that the original declarations were insufficiently detailed, and Halbig waived any challenge to the itemized billing records when he did not request a continuance to consider the additional information and chose not to "quibble about individual entries" at the hearing.

Addressing the trial court's substantive decision to award $22,000 in attorney's fees and $495 in costs to Roe, we review the trial court's ruling for abuse of discretion and will "interfere with the trial court's determination of the amount of reasonable attorney fees only where there has been a manifest abuse of discretion." (*Almanor*, *supra*, 246 Cal.App.4th at p. 777.) Contrary to Roe's contention, nothing in the text of section 1987.2, subdivision (c) or the provision's legislative history indicates that the trial court should apply a special, statute-specific rule when determining whether the expenses incurred in making the motion were "reasonable." (§ 1987.2, subd. (c).) Therefore, we conclude that the phrases "reasonable expenses" and "reasonable attorney's fees" in section 1987.2, subdivision (c) have the same meaning as they do in analogous statutes.

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.) "A court assessing attorney fees begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' " (*Ketchum*, *supra*, 24 Cal.4th at

25

pp. 1131-1132.) The lodestar figure may then be adjusted upward or downward by the court based on a number of factors. (*Ibid.*)

The California Supreme Court has upheld the use of the lodestar method in calculating attorney's fees associated with a successful anti-SLAPP motion to strike. (*Ketchum*, *supra*, 24 Cal.4th at p. 1137.) It has also generally applied a presumption that the Legislature intends courts to use the lodestar method in determining all attorney fee awards. (*Ibid.*) Nevertheless, a trial court is not obligated to use the lodestar method. (*Laffitte* v. *Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 504.) And even if a trial court does use the lodestar method, it does not have to articulate that method explicitly. (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 101 (*Gorman*).)

Trial courts must, however, begin any calculation of reasonable attorney's fees with the total number of hours counsel have actually spent on the case. " 'The starting point of every fee award . . . must be a calculation of the attorney's services in terms of the time he [or she] has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' " (*Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322.) In setting attorney's fees "[t]he basis for the trial court's calculation must be the actual hours counsel has devoted to the case, less those that result from inefficient or duplicative use of time." (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 395.) "Absent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for all the hours reasonably spent, including those relating solely to the fee." (*Ketchum*, *supra*, 24 Cal.4th at p. 1133.)

The record before the trial court established that, by the time the motion to quash was heard, Roe's senior attorney had spent 47 hours on the case, billing at $275/hour ($12,925 in total); the mid-level attorney had spent 8.7 hours, billing at $240/hour ($2,088 in total); and the junior attorney had spent 136.3 hours, billing at $200/hour

($27,260 in total). The total bill came to $42,273 for 192 hours of attorneys' work plus $308 for the paralegal's time. Based on these numbers, the trial court stated, "[$]42,000 was a lot, extreme in setting in this case. . . . I think a petition to quash a subpoena should not require that amount of time. So I'm going to award $22,000 in fees."

The trial court made clear that, in its view, Roe's attorneys had spent an unreasonable amount of time on the case. The trial court is entitled to draw that conclusion, for, "an 'experienced trial judge is the best judge of the value of professional services rendered in [her] court.' " (*Walent* v. *Commission on Professional Competence etc.* (2017) 9 Cal.App.5th 745, 748.) Nevertheless, the starting point for the trial court's calculation must be all of the hours counsel has spent on the case.

Roe suggests that perhaps the trial court awarded an amount equal to the time his attorneys spent on the initial motion to quash. If the trial court's fee award were based on this metric, it would constitute an abuse of discretion. Halbig filed an opposition to the motion to quash and withdrew the subpoena; both of those events reasonably required further briefing from Roe. An award based solely on the attorney hours spent preparing the initial motion to quash would violate the principle that the starting point of the fee calculation must be all of the attorney hours actually spent on the case. (*Ketchum*, *supra*, 24 Cal.4th at pp. 1131-1132.)

Furthermore, while we have rejected the idea that section 1987.2, subdivision (c) employs a special rule for determining reasonable expenses, we are mindful that the legislative history of the provision does reflect a desire to "allow those whose records or other information are being sought, and subpoenaed witnesses, including online service providers, to recover their costs and attorneys' fees in resisting abusive subpoenas." (Assem. Com. on Judiciary, Rep. on Assem. Bill No. 2433 (2007-2008 Reg. Sess.) as amended Apr. 2, 2008, p. 2.) Additionally, we are puzzled by the trial court's observation of how much time a motion to quash a subpoena "should" take, when the motion to quash at issue here was brought under a statutory provision that was not the

subject of any case law (either published or unpublished) and would reasonably take more time to research and litigate than an ordinary motion to quash a subpoena. In any event, the supposition that the trial court awarded the amount equal to the time spent on the initial motion to quash does not mathematically compute. The declaration accompanying the motion to quash requested $21,874 in attorney's fees, which is close to, but does not equal, the $22,000 the trial court ultimately awarded.

After applying all presumptions in favor of the trial court's determination, on the record before us, we cannot determine how the trial court arrived at $22,000 for 192 hours of attorney time. "A trial court's award of attorney fees must be able to be rationalized to be affirmed on appeal. . . . When a trial court makes an award that is inscrutable to the parties involved in the case, and there is no apparent reasonable basis for the award in the record, the award itself is evidence that it resulted from an arbitrary determination. It is not the absence of an explanation by the trial court that calls the award in this case into question, but its inability to be explained . . . ." (*Gorman*, *supra*, 178 Cal.App.4th at p. 101.)

"The abuse of discretion standard is 'deferential,' but it 'is not empty.' " (*Gonzalez*, *supra*, 9 Cal.App.5th at p. 169.) Because we cannot determine how the trial court arrived at the attorney's fees it awarded, we cannot assess whether the trial court properly exercised its discretion. "When the record is unclear whether the trial court's award of attorney fees is consistent with the applicable legal principles, we may reverse the award and remand the case to the trial court for further consideration and amplification of its reasoning." (*In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1052.) Consistent with this principle, we reverse the fee award and remand to the trial court for further consideration. For the trial court's benefit on remand, we note that paralegal fees may be awarded as attorney's fees if the trial court deems it appropriate (*Gorman*, *supra*, 178 Cal.App.4th at pp. 96, 100-101), and observe that attorney's fees for travel hours may be awarded if the court determines they were reasonably incurred

28

(§ 1987.2, subd. (c); see *Citizens Against Rent Control v. Berkeley* (1986) 181 Cal.App.3d 213, 232-234).  We also vacate the trial court's award of costs so that the trial court may fully reconsider the appropriate award to Roe.

With respect to Roe's request for costs and attorney's fees on appeal, "[a] statute authorizing an attorney fee award at the trial court level includes appellate attorney fees unless the statute specifically provides otherwise."  (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1499.)  Section 1987.2, subdivision (c) does not foreclose appellate attorney fees.  Therefore, Roe is entitled to them.  (See Cal. Rules of Court, rule 8.278(a)(1).)  The trial court is directed to determine appellate fees and costs in the first instance.  (See Cal. Rules of Court, rule 8.278(c).)

## III.  DISPOSITION

Regarding Roe's entitlement to an award of attorney's fees and costs, the order appealed from is affirmed.  Regarding the amount of attorney's fees and costs awarded, the order appealed from is reversed.  The matter is remanded to the trial court for determination of Roe's reasonable expenses, including reasonable attorney's fees.  Roe shall also recover attorney's fees and costs on appeal, in amounts to be determined by the trial court.

_____
DANNER, J.

WE CONCUR:


_____
GREENWOOD, P.J.



_____
GROVER, J.




*Roe v. Halbig*
**H043248**

Trial Court:                                              Santa Clara County Superior Court
                                                         Superior Court No.:  1-15-CV280191


Trial Judge:                                             The Honorable Mary Arand



Attorneys for Petitioner and Appellant                  McCormick, Barstow, Shepard,
John/Jane Roe:                                          Wayte & Carruth
                                                        James P. Wagoner
                                                        Graham Van Leuven



Attorney for Respondent and Appellant                   Nicholas Ranallo
Wolfgang Halbig:




*Roe v. Halbig*
**H043248**