Filed 7/12/23  G.G. v. B.E. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| G.G., | B312668 |
| Plaintiff and Appellant, | Los Angeles County Super. Ct. No. BF059347 |
| v. | |
| B.E., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Doreen B. Boxer, Commissioner.  Reversed in part, affirmed in part, and remanded with directions.

Reuben Raucher & Blum, Timothy D. Reuben, Stephanie I. Blum, and Andrew J. Ahn for Plaintiff and Appellant.

Walzer Melcher & Yoda, Christopher C. Melcher and Steven K. Yoda for Defendant and Respondent.

## INTRODUCTION

In California, a parent's overriding duty is to support his or her minor children according to the parent's ability and station in life. (Fam. Code,[1] § 4053, subd. (a).) Although parents may stipulate to appropriate child support, such agreements must comport with state guidelines and are subject to judicial review. Modifications to child support orders are also subject to judicial oversight. For this reason, child support orders may not contain "future contingencies"—adjustments to the amount or type of support, triggered by the occurrence of some future event—that, by virtue of being automatic, circumvent statutory modification procedures or judicial oversight.

Ten years ago, respondent B.E. (father) and appellant G.G. (mother) had a child, E.P..[2] Mother brought a paternity action, which she and father resolved by stipulated judgment.[3] The agreement purported to set varying levels of child support and reimbursable expenses keyed to events that could arise in the future, such as a change in mother's employment status or E.P.'s age.

---

[1] Undesignated statutory references are to the Family Code unless otherwise noted.

[2] We refer to the parties as "father" and "mother" to preserve their privacy; we intend no disrespect in doing so. (See *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 280, fn. 1 (*Cheriton*).)

[3] We refer to the agreement that formed the basis of the stipulated judgment as the "settlement agreement," "settlement," or "agreement."

When mother lost her job, she sought increased child support.  Father asserted he should only have to pay the extra $123 per month contemplated in the settlement.  As relevant here, the trial court agreed that the settlement controlled; it concluded mother's unemployment did not constitute a "change in circumstances that would support a modification of the child support order" because the order had anticipated that mother might lose her job or change careers and had established a corresponding level of support under those circumstances.  The court did not explicitly determine the parties' current incomes.

We conclude the trial court erred by adopting the provisions of the stipulated judgment without exercising its independent judgment as required by the Family Code and public policy.  We also conclude that some of the court's orders limiting mother's need-based attorneys' fees and imposing discovery sanctions on her were an abuse of discretion.  We therefore affirm in part, reverse in part, and remand with directions.

## BACKGROUND

### A.    The Parties' Background

Father is a successful writer who has published numerous novels and short stories.  Father is married to L.R., who currently works as a literary agent.  They have a daughter in her mid-20s.

In February 2013, after meeting at a conference, father and mother began a relationship that lasted for nearly two years.  At the time, mother lived in Florida; she was also married.  In November 2013, mother gave birth to E.P.  An unofficial DNA test indicated that father was the likely father. The relationship continued, and a year later, in November 2014, mother became pregnant a second time.  The second pregnancy prompted father

3

to disclose the relationship to his wife. Father also told L.R. that he had been supporting E.P. informally, paying mother about $1,000 per month.

In December 2014, father and mother began negotiating a private child support agreement. Meanwhile, in February 2015, father emailed his accountant to report that his wife had been informally serving as his literary agent since 2011. He explained that even though the "money is going to the same household (indeed, it goes into the same joint bank account)," he wanted to formalize the arrangement by paying his wife a 15 percent commission on all of his earnings, retroactive to the beginning of 2014.

On April 28, 2015, father signed a book contract with a large publisher in which his wife was designated as his agent. The contract provided that L.R. was to receive a 15 percent commission on father's earnings. Before paying father, the publisher was to pay this commission directly to L.R.

Two days later, father and mother signed a private settlement agreement, governed by the laws of Florida, where mother still lived. Under the settlement, father agreed to pay $3,000 per month in child support for E.P. Upon the birth of the second child, and contingent upon paternity testing, father would increase his monthly payment to $3,500 for both children. He would also maintain a life insurance policy for the benefit of the children. Mother would have full custody of E.P. and any additional child; father would have no parental responsibility. Mother waived all claims for retroactive support.

Once the agreement was signed, father ceased all contact with E.P. Mother miscarried soon thereafter.

In July 2015, mother and her husband began divorce proceedings; the divorce was finalized in December 2016. As part of the divorce settlement, mother agreed to "an order of disestablishment of paternity" of E.P.

**B.      Mother and E.P. move to California**

In February 2017, mother accepted a job as a writer for a network television program and moved to California with E.P.. In light of the higher cost of living in California, mother reached out to father for financial assistance. He was not receptive.

On May 15, 2017, mother filed a petition to establish paternity in California. Although father and mother tried to negotiate a settlement, their efforts were unsuccessful. On July 19, 2017, father sued mother in Florida for fraud, claiming she had violated the private settlement agreement. Father sought rescission of the Florida agreement, return of all payments made for E.P.'s support pursuant to the agreement, attorneys' fees, and punitive damages.

At some point thereafter, father and his wife signed a formal agreement under which she would work as his literary agent. The contract is undated, but purports to be effective as of August 20, 2017. The agreement acknowledged that "the parties are married to each other and have not previously felt the need to account for" L.R.'s work on father's behalf, but stated that "for various financial reasons, they wish to do so now." As compensation, father agreed to pay his wife "an irrevocable commission of 35% on all amounts [father] receives directly or

indirectly from the Works, both new and existing."[4]  Therefore, L.R.'s 35 percent commission extends to any royalties father receives pursuant to existing contracts.

Meanwhile, father and mother continued to negotiate in the paternity action and ultimately reached a child support agreement, which mother signed on October 31, 2017.  Father signed it the following day.  According to the agreement, mother's monthly income at the time was $4,147 and father's was $43,942.  The settlement voided the earlier private agreement and provided that upon entry of judgment, father would dismiss the Florida lawsuit.

Two days later, on November 3, 2017, father signed a new book contract with the same large publisher.  The contract identified L.R. as father's literary agent and stipulated that she was to receive a 35 percent commission on all of his earnings.  The publisher is to pay L.R. directly.  Thus, for every dollar father earns under the contract, the publisher pays L.R. $0.35 and pays father $0.65.

The settlement agreement was entered as a stipulated judgment in the paternity action on December 22, 2017.

## C.    Mother Seeks Modification

On August 12, 2019, mother filed a motion to increase child support.[5]  Mother alleged that since entry of the stipulated judgment, her income had declined because she had lost her job,

---

[4]  The contract defines the "Works" as father's "novels, short stories, screenplays, and teleplays."

[5]  The order resolving that motion is the subject of this appeal.

and father's income had increased. Mother claimed her expenses had also increased because E.P. had been diagnosed as "twice exceptional," meaning she was an intellectually gifted child who had also been diagnosed with Attention Deficit Hyperactivity Disorder, thus requiring special educational support. Mother sought increased child support, increased childcare expenses, expenses for extracurricular activities, and private school tuition.[6] Finally, mother asked the court to award her $15,000 in need-based attorneys' fees—both to reimburse her for past fees and to provide pendente lite fees going forward.[7]

In response, father asked the court not only to deny mother's request to increase child support, but also to decrease the amount of his child support because his income had declined in 2018. Father argued that mother's unemployment was not a changed circumstance justifying a modification to the stipulated judgment because the settlement agreement expressly anticipated that she might become unemployed and had provided for that eventuality. Father also asked the court to deny mother's request for need-based attorneys' fees and to require her, instead, to pay *his* attorneys' fees under the prevailing-party provision in their settlement agreement.

---

[6] Mother later withdrew the tuition request.

[7] A request by a party in a parentage proceeding for an award of fees that have not yet been—but are expected to be—incurred is referred to as a request for "pendente lite" fees. *Pendente lite* is a Latin phrase meaning "while the action is pending." (Garner, Dict. of Modern Legal Usage (3d ed.2011) p. 665.)

The court called the matter for hearing on October 7, 2019. But mother, who is hard of hearing, had not requested a CART reporter in advance, and no one was available to assist on short notice.[8] Accordingly, the court continued the hearing to February 3, 2020.

On December 11, 2019, with mother's fee application still pending, attorney Mark Karney substituted out as counsel of record and was replaced by attorney Maryam Atighechi.

## D.    Discovery

After the court continued the hearing, the parties propounded numerous discovery requests on one another.[9] Ultimately, father's counsel and mother's new lawyer filed—and extensively litigated—ten motions between them to enforce or block various requests.

The court appointed retired Judge Reva Goetz to serve as discovery referee. After a hearing on February 19, 2020, Judge Goetz recommended that the court grant all of father's motions,

---

[8] Communication Access Real-time Translation (CART) converts the spoken word into instant text. (*Technology Credit Union v. Rafat* (2022) 82 Cal.App.5th 314, 318.) Using that technology, CART reporters act as court interpreters for the deaf or hearing-impaired.

[9] The continuance had the effect of reopening discovery, which had closed 30 days earlier. (See Code Civ. Proc., § 2024.020, subd. (a) [discovery deadline]; § 218 [defining "date initially set for trial of the action" in family law cases.)

deny all of mother's motions, and impose $14,000 in sanctions on mother and her lawyer.[10]

On March 13, 2020, the trial court ruled on the discovery motions in accordance with Judge Goetz's recommendations but reserved ruling on most of the sanctions issues. A month later, on April 13, 2020, with mother's application for need-based attorneys' fees still unresolved, Atighechi substituted out as mother's attorney of record.

**E. Mother Represents Herself**

On June 10, 2020, mother, now acting in propria persona, filed an ex parte application for need-based pendente lite attorney's fees. Father opposed the motion. Among other things, father argued that because the stipulated judgment contained a fee-shifting provision, fees could not be awarded until a prevailing party could be determined. The court initially continued the ex parte hearing to September 1, 2020, to be heard with the related request for order, but ultimately granted father's motion to strike mother's entire memorandum and supporting declaration because they violated the court's typography requirements. It does not appear that the court struck the application itself, however.

On June 26, 2020, mother filed an ex parte request for emergency childcare expenses. Father opposed the motion, arguing that the settlement agreement already addressed

---

[10] Specifically, Judge Goetz recommended the court impose $6,000 to be paid by attorney Atighechi individually, $3,000 to be paid by mother individually and $5,000 to be paid jointly and severally. We address the discovery motions and sanctions recommendations in detail below.

childcare payments in the event mother lost her job, and, regardless, because E.P. had started kindergarten a year earlier than forecast in the agreement, father had been *overpaying* for childcare. The court denied mother's request. It held that mother had "failed to make affirmative showing of the need for orders to help prevent an immediate danger or irreparable harm to a party or to the children, or to prevent immediate loss or damage to property subject to disposition in this case, and has failed to support any other basis for this court to grant relief ex parte." It held, however, that mother could bring the claims via a regularly-noticed Request for Order.

On August 5, 2020, attorney Stephanie Blum substituted in as mother's attorney of record.

**F.     Court's Order**

On September 1, 2020, the trial court held an evidentiary hearing on the request for order, the original request for need-based attorneys' fees, and the deferred requests for discovery sanctions. The court took the issues under submission and ordered the parties to submit written closing arguments. The court later vacated this submission and indicated it would resubmit the matter on February 1, 2021.

The court issued a written order and statement of decision on March 19, 2021. The court denied mother's request to increase child support, holding that because the stipulated judgment contemplated and provided for mother's possible unemployment, mother had not established a change in circumstances. It also denied father's request to decrease child support.

As for mother's request for need-based attorneys' fees, the court found that mother was entitled to need-based fees under

10

section 7605 but granted her request only as to Karney's work—and then only in part. The court declined to award any fees for Atighechi's work on the ground that Atighechi had overlitigated the case and was responsible for all of the discovery abuses. The court concluded that at least some of Blum's work was necessary to bring the case to a close, but nonetheless denied the fee request for her work in its entirety because her settlement efforts were unsuccessful, and she had not provided sufficiently detailed billing records. In sum, although the court calculated that mother had generated $145,413.50 in attorneys' fees, it awarded her only $4,720.50.[11]

Finally, the court ordered mother to personally pay sanctions to father for unsuccessfully opposing two of his discovery motions, thereby requiring father to file motions to compel, and refusing to withdraw two facially-defective subpoenas, thereby requiring him to file motions to quash. The amount of sanctions totaled $24,600, the sum of attorneys' fees father incurred in relation to the motions.

Mother filed a timely notice of appeal.

## DISCUSSION

A. **The trial court abused its discretion by denying mother's modification request based on invalid future contingencies in the stipulated judgment.**

When father and mother reached their settlement agreement, father was a successful novelist, and mother was working as a first-time writer on a network television show.

---

[11] The court noted that father had generated $491,511 in attorneys' fees as of December 31, 2020.

11

Father is still a successful novelist, but mother's show was canceled, and she is now unemployed. When mother asked for an increase in child support and childcare payments, however, father pointed to the agreement, which had contemplated that mother might lose her job or change careers and provided for various adjustments to father's payments if she did. The court held that mother's new employment status did not constitute a change in circumstances sufficient to modify the child support award because the parties' 2017 agreement accounted for the possibility that mother might become unemployed in the future. On appeal, mother contends this was error because the provisions purporting to predict and respond to possible future events were "future contingencies," which are invalid under California law. We agree.

### 1. Forfeiture

As an initial matter, father argues that mother has forfeited her appellate claim that the unemployment provisions are invalid future contingencies because she failed to challenge the stipulated judgment on this basis below. Mother contends her arguments in the trial court were sufficient to preserve the issue but asks us, in the alternative, to exercise our discretion to consider the issue on appeal notwithstanding forfeiture. Although we find that mother did not clearly raise the issue below, we address it on the merits because it involves a pure question of law and implicates important matters of public policy.

Typically, a party forfeits any claim of error that he or she fails to raise in the trial court. (*In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 512.) "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" (*In re S.B.*

12

(2004) 32 Cal.4th 1287, 1293.) But neither forfeiture nor application of the forfeiture rule is automatic. (*Ibid*.) Thus, the "rule does not apply when the theory raised for the first time on appeal is a pure question of law applied to undisputed facts. [Citations.]" (*Martorana v. Marlin & Saltzman* (2009) 175 Cal.App.4th 685, 699–700.) "[I]n cases presenting an important legal issue," we may exercise our discretion to consider the claim notwithstanding failure to present it below. (*In re S.B.*, at p. 1293.)

Mother did not provide the trial court in this case with clear, reasoned legal argument about California's prohibition of future contingencies in child support orders. In an effort to save her claim, mother points to several remarks in the record below, which she argues adequately alerted the trial court to the future-contingency problem. We are not persuaded.

Mother notes that her initial moving papers and written closing argument challenged the stipulated judgment's unemployment provision. These discussions, however, did not claim that future contingencies were invalid in general. Mother also argues that father placed the issue before the court in his written closing argument and his reliance on *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1476, a spousal support case. However, neither this case nor father's argument directly address the validity of future contingencies in child support agreements.

Thus, we agree with father that the issue of future contingencies was not squarely before the court below. Nevertheless, we exercise our discretion to resolve the issue on the merits. Mother contends the stipulated judgment contains provisions that are void as a matter of law. This is a legal

question based upon the undisputed contents of the stipulated judgment in evidence before the trial court. (See *County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 326–327 [appellate courts may address issues not raised in the trial court when the appellate theory involves a legal question determinable from facts that are uncontroverted in the record and could not have been altered by the presentation of additional evidence].)

The issue also implicates important public policy concerns. "'California has a strong public policy in favor of adequate child support,'" as expressed in the statutes that embody the statewide uniform child support guideline and place the interests of children as the state's top priority. (*In re Marriage of Bodo* (2011) 198 Cal.App.4th 373, 385; § 4053, subd. (e) [uniform child support guideline "seeks to place the interests of children as the state's top priority"]; see §§ 4050–4076 [statewide uniform guideline].) "A parent's first and principal obligation is to support his or her minor children according to the parent's circumstances and station in life." (§ 4053, subd. (a).) Mother argues the parties reached a private agreement containing illegal terms that deprived E.P. of support to which she was legally entitled. In our view, the importance of the public policy at issue warrants an exercise of discretion to consider the matter on the merits.

### 2.     Standard of Review

Child support orders are reviewed for abuse of discretion. (*Cheriton*, *supra*, 92 Cal.App.4th ap pp. 282, 304.) Under that standard, we determine "'whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.' [Citation.] We do not substitute our own judgment for that of the

14

trial court, but determine only if any judge reasonably could have made such an order.  [Citation.]" (*In re Marriage of Schlafly* (2007) 149 Cal.App.4th 747, 753 (*Schlafly*).)  In so doing, however, we must bear in mind that "California has a strong public policy in favor of adequate child support," that "'determination of a child support obligation is a highly regulated area of the law,'" and that "'the only discretion a trial court possesses is the discretion provided by statute or rule. [Citations.]' [Citation.]" (*Cheriton*, at p. 283.)  Thus, in exercising its discretion, a court must not only base its findings on substantial evidence but must also follow established legal principles.  (*Schlafly*, at p. 753.)  The failure to do so constitutes an abuse of discretion.  (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 931.)

### 3.     Legal Principles of Child Support

In California, child support is based on a statutory algebraic formula whose main variables are the parents' disposable incomes and their respective shares of time with primary physical responsibility for the children.  (§ 4055.)  "Every trial judge making a child support order must begin by 'making a formula calculation pursuant to section 4055.' [Citation.]  The provision 'sets forth a statewide uniform guideline for determining the appropriate amount of child support.  The term "guideline," however, is a euphemism.  The support amount rendered under the guideline's algebraic formula "is intended to be presumptively correct in all cases, and only under special circumstances should child support orders fall below the child support mandated by the guideline formula."' ([Citation], quoting § 4053, subd. (k).)" (*Y.R. v. A.F.* (2017) 9 Cal.App.5th 974, 983.)

15

Formula child support is a share of the parents' "net monthly disposable income" (§ 4055, subds. (a) & (b)), computed by totaling "annual gross income" (§ 4058 [income from whatever source derived subject to certain exceptions]), less allowable deductions, to arrive at "annual net disposable income" (§ 4059), then dividing by 12 to yield "monthly net disposable income" (§ 4060). (*Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1336.) The amount must be set using each parent's income, expressed in fixed dollar amounts, as of the time of the hearing. (*In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 317–318.) In other words, child support is limited by the conditions and circumstances existing at the time the order is made—and the court cannot speculate about what might happen later by providing for automatic adjustments based on future contingencies. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 298.)

Because of this limitation, a permanent child support order may be modified when changed circumstances affect a party's financial status. (§ 3651, subd. (a); *Cheriton*, *supra*, 92 Cal.App.4th at p. 298; *In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015 [modification appropriate where there has been a significant change in a party's net income].) Typically, the party seeking modification must establish that there has been a material change in circumstances since the prior support order. (*Cheriton*, at p. 298.) Once changed circumstances are established, the trial court, as with an initial order, must calculate child support under the guideline formula. The resulting order "may be made retroactive to the date of filing the petition, complaint, or other initial pleading." (§§ 4009, 3651, subd. (c)(1); *In re Marriage of Murray* (2002) 101 Cal.App.4th

16

581, 595 [filing date establishes the outermost limit of retroactivity].)

The Legislature has also enacted detailed guidelines for modification of child support, a process that likewise requires judicial approval. (See §§ 3650–3693, 3651, subd. (a) [court may terminate or modify child support orders "at any time as the court determines to be necessary"].) "Those procedures require a party to introduce admissible evidence of changed circumstances as a necessary predicate for modification. [Citations.]" (*Cheriton*, *supra*, 92 Cal.App.4th at p. 298.) Where the parties cannot agree, "'contested factual issues . . . require an evidentiary hearing.' [Citation.]" (*Ibid*.) Taken together, "the statutes contemplate that the determinations necessary to support a child support modification will be made by a judge" and "based on the parties' then current circumstances." (*Ibid*.) Although parents "may stipulate to a child support amount," any agreement is "subject to approval of the court." (§ 4065, subd. (a).)

4. **Because the stipulated judgment circumvented the required statutory procedures for modification of child support, the trial court erred by restricting its review to the future contingencies specified in the agreement.**

Whether crafted by the parties or by the courts, child support orders must be limited to the conditions and circumstances that exist at the time they are made. In *Cheriton*, the trial court was called upon to craft a child support order for a family in which both parents had fluctuating incomes based on interest, dividends, capital gains, and bonuses. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 295.) Each parent also had stock options that, when exercised over time, would create substantial new

17

income.  (*Ibid*.)  In an attempt to avoid future litigation via successive modification motions, the court fashioned a system in which the parties were ordered to exchange proof of income each year, then meet and confer to revise guideline support and pay arrearages for the previous year.  (*Ibid*.)  The appellate court reversed.

Although the trial court's approach may have avoided future litigation, it came at the cost of judicial supervision of a vitally important matter.  (*Cheriton*, *supra*, 92 Cal.App.4th at pp. 298–299.)  The yearly income exchange and recalculation method amounted to a series of automatic changes to the child support order—future contingencies—that might not meet statutory guidelines.  Any violations would evade detection, however, because under the order, the changes were triggered automatically and implemented without judicial approval.  (*Ibid*.)  With no explanation by the trial court of the variables involved, there would be no adequate record on appeal, thereby stymying appellate review as well.  (*Ibid*.)  Accordingly, the *Cheriton* court concluded that the future contingencies were invalid.

Although *Cheriton* involved future contingencies crafted by a trial court, its ruling applies with equal force to parties who provide for future events in stipulated judgments.  Parents "do not have the power to agree between themselves to abridge their child's right to support.  [Citation.]  Nor can they restrict the court's power to act on behalf of the child in support, custody, or parentage proceedings.  [Citations.]  'Agreements and stipulations compromising the parents' statutory child support obligation or purporting to divest the family court of jurisdiction over child support orders are void as against public policy. [Citations.]'  [Citation.]"  (*In re Marriage of Lusby* (1998) 64

18

Cal.App.4th 459, 469; accord *In re Marriage of Bereznak* (2003) 110 Cal.App.4th 1062, 1069 [child support "agreements, to the extent that they purport to restrict the court's jurisdiction over child support, are void as against public policy"]; *In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 727 ["parents cannot, by agreement, prevent the court from increasing a child support order or otherwise limit the right of their minor children to support"]; *In re Marriage of Lambe & Meehan* (1995) 37 Cal.App.4th 388, 392 ["Parents cannot agree to limit the power of the family law court with respect to the welfare of children"].) "That is because 'the law puts the child's interests before the contractual expectations of the parents. Courts will not respect agreements that have the effect of contracting away the child's right to support. [Citations.]' [Citations.]" (*Cheriton, supra*, 92 Cal.App.4th at p. 294.)

In this case, as father acknowledges, the stipulated judgment was explicitly structured to account for and respond to a number of future possible alternatives. Section III.A. of the agreement explains its tiered structure for child support:

> "The parties have structured this Section III to account for three possibilities they can foresee for [mother]'s career: writers' room employment, non-writers' room employment, and unemployment. For each possibility, the parties have accounted for: (i) child support; (ii) [E.P.]'s uncovered medical expenses; (iii) the cost of [E.P.]'s health insurance; and (iv) the cost of childcare for [E.P.] They have also attempted to account for [E.P.]'s changing needs as she enters kindergarten, first grade, and beyond. The parties have agreed on this structure in recognition of: (i) the volatile nature

19

of the television writing industry in which [mother] is newly employed; (ii) the different levels of childcare [E.P.] will need depending on [mother's] employment and [E.P.]'s age; and (iii) the parties' mutual intention of minimizing contact or consultation with each other and of minimizing the likelihood of future litigation."

The agreement then addressed these various possibilities. For example, if mother remained "employed in a television show writers' room," father would pay her $3,817 per month in child support. If she took a position in some other field, child support payments and health insurance contributions would stay the same, but reimbursable childcare expenses would drop—from $1,250 per month to $500 per month if mother changed jobs before September 2019 *or* from $625 to $350 if she changed jobs after September 2019 but before September 2020. If she changed jobs after September 2020, however, childcare reimbursements would hold steady at $300 per month.

The agreement also offered various scenarios for mother's possible unemployment. Should mother become unemployed, monthly child support was to increase by $123 (from $3,817 to $3,940) and father's maximum contribution to E.P.'s health insurance premiums would increase from $100 to $200. On the other hand, father's responsibility for E.P.'s uninsured healthcare expenses would remain the same regardless of mother's employment status, and his contribution to childcare expenses would be reduced to either $350 or $300, depending on when mother lost her job.

Read as a whole, the agreement offered a plethora of caveats and predictions about the impacts of future contingencies on E.P.'s needs. In California, "jurisdiction to make child support

orders 'is limited to the conditions and circumstances existing at the time they are made, and the court [and the parties] cannot then anticipate what may possibly thereafter happen and provide for future contingencies. [Citations.]' [Citations.]" (*Cheriton*, 92 Cal.App.4th at p. 298.) Thus, insofar as it attempts to provide for future contingencies, the stipulated judgment is void because it limits the court's jurisdiction. (*Ibid.*)

Father emphasizes that he "*does not* dispute [mother]'s theoretical point—namely, that child support orders should not provide for future contingencies." He insists, however, that the rule does not apply in this case. He argues that the portions of the stipulated judgment in which different amounts of child support, childcare, and health insurance are triggered by a variety of theoretical events are not "future contingencies." Instead, he asserts, those provisions simply account for the parties' "'reasonable expectations' supported by the evidence." In other words, "[mother]'s unemployment was not a 'future contingency' but rather a 'reasonable expectation' based on *facts*." Unlike "future contingencies," father argues, agreements about possible future events are allowed if they are based on "reasonable expectations."

Father cites no authority to support his claim that parents may limit child support and avoid the supervision of the courts based on their "reasonable expectations" about what may occur in the future and how such possible alternatives may affect their child support obligations—and our research has revealed none. Instead, father relies on cases considering spousal support, not child support.

For example, in *Marriage of Dietz*, the court held that when determining whether a "material change" had occurred to justify

21

modification of spousal support, the trial court was required to give effect to the marital settlement agreement, a stipulated judgment that reflected a "bargained-for exchange through which [the parties] agreed how they would divide their assets, including their community property interests in the retirement accounts." (*In re Marriage of Dietz* (2009) 176 Cal.App.4th 387, 399.) Although it appears the parties had a son for whom the husband paid child support, the case did not address any dispute about the child support payments. (*Id.* at p. 391.)

Although the cases father relies on all involve disputed spousal support, which is not at issue here, father asks us to apply the analytical framework used in those cases to determine his child support obligations. We decline to do so.

Child support and spousal support serve different purposes, implicate different policies, and are governed by different rules. (Compare § 4053, subd. (e) [concerning child support, the legislative policy is to treat "the children's interests as the state's top priority"] with § 4320, subd. (l) [concerning spousal support, the legislative policy is for the supported spouse to become "self-supporting within a reasonable period of time"]; compare § 4052 [for child support, "court shall adhere to the statewide uniform guideline"] with § 4320, subd. (n) [for spousal support, court shall consider enumerated circumstances including "other factors the court determines are just and equitable"]; see also, e.g., *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 49 [public policy prohibits waiver of child support but not spousal support]; *In re Marriage of Lynn* (2002) 101 Cal.App.4th 120, 130, fn. 7 [same]; *Cheriton, supra,* 92 Cal.App.4th at p. 308 [when imputing income to the payee spouse, child support order must "consider the children's best interests" but no such requirement applies to

22

spousal support order]; *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 527–528 [guideline child support is highly regulated and "relatively fixed" whereas permanent spousal support orders must be "the product of a truly independent exercise of judicial discretion"].) In sum, under California law, parents may not contractually compromise their children's right to support. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 294.)

Perhaps recognizing this distinction, father focuses on *Philbin v. Philbin* (1971) 19 Cal.App.3d 115 (*Philbin*), which involved both child and spousal support. In that case, the husband, a famous television personality, moved to decrease spousal and child support after his income declined by about 70 percent in a single year. (*Id.* at pp. 118–119.) The trial court agreed to decrease both types of support payments—but only for six months, after which they would automatically revert to their previous level. Because nothing in the record supported an inference that the husband's income would rebound in six months, the reviewing court deleted the snap-back provision, leaving the support order at the lower amount. (*Id.* at p. 121.) The *Philbin* court emphasized that when ordering support, the trial court "cannot anticipate what may possibly happen in the future or provide for future contingencies in making an order but is limited to the facts and circumstances existing at the time the same is made." (*Id.* at p. 122.)

But father does not rely on that holding, which is consistent with the holding in *Cheriton*. Instead, he depends on an observation the court made *about* its holding. The *Philbin* court noted that its disposition rested on the lack of record support for a "reasonable expectation" concerning the husband's future income. (*Philbin*, *supra*, 19 Cal.App.3d at p. 121.) *Philbin*'s

23

entire discussion of the point is: "If the record supports such limitation, of course an order of this kind is proper, but the restoration of the original payments in six months is here based on a finding of a reasonable expectation that in the near future respondent's finances will rise to their former level ($55,000 in 1968, $95,000 in 1969), wholly unsupported by the evidence." (*Ibid*.) Father insists this statement makes it "crystal clear" that "child support orders *can* account for the parties' reasonable expectations." We disagree.

The *Philbin* court's comment was unnecessary to its conclusion, and was therefore dictum. (See *Gogri v. Jack In The Box Inc.* (2008) 166 Cal.App.4th 255, 272 ["'Only statements necessary to the decision are binding precedents . . . .' [Citation.] 'The doctrine of precedent, or stare decisis, extends only to the ratio decidendi of a decision, not to supplementary or explanatory comments which might be included in an opinion.'"].)

In sum, we conclude that, under *Cheriton*, the stipulated judgment is void to the extent it purports to adjust father's payment obligations to account for hypothetical events that had not occurred when the agreement was signed, thereby circumventing judicial oversight of child support obligations. Accordingly, the court erred by restricting its review to the future contingencies specified in the agreement.

> **5.      Mother was prejudiced by the trial court's reliance on the stipulated judgment and its subsequent failure to independently review the parties' current circumstances.**

To be reversible, an error must be prejudicial, resulting in harm or a miscarriage of justice. (*In re Marriage of Zucker* (2022) 75 Cal.App.5th 1025, 1029; Cal. Const., art. VI, § 13.) Thus, in

24

addition to demonstrating that the stipulated judgment contains invalid future contingencies, mother must also establish that the court's order harmed her.  An error of state law is prejudicial if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)  We conclude that it is reasonably probable mother would have obtained a more favorable result if the court had evaluated the parties' current circumstances instead of relying on the invalid future-contingency provisions.

As discussed, when mother lost her job, she sought increased child support and childcare expenses.  To adjudicate mother's request, the court was required to determine whether there had been a material change in the parties' circumstances since the previous order.  (*Cheriton*, *supra*, 92 Cal.App.4th at p. 298; § 3651, subd. (a).)  To do that, the court needed to calculate each party's current "net monthly disposable income" under section 4055 and compare it to their incomes at the time they entered into the agreement.  That is, the court was required to determine what mother and father currently earned and spent, compare it with the amount they earned and spent when the stipulated judgment was entered, and decide if any differences were material.  The court was also required to consider other relevant circumstances, such as the impact of the Covid-19 pandemic on E.P.'s childcare needs and mother's employment prospects.

The court did not do this.  When she signed the agreement, mother's income was $4,167 per month; when she sought modification, she alleged she was unemployed, and that her income had declined by at least half.  On the other hand,

immediately after signing the stipulated settlement, father signed a new publishing contract—for which he was paid a one million dollar advance—that diverted 35 percent of his pretax earnings to his wife as an "agent commission" before the remaining 65 percent was paid to him. Father's current net income, therefore, depended in part on whether that commission was valid. (See § 4059 [state and federal tax liability for computing child support based on gross income].) Instead of ascertaining the parties' present incomes and circumstances, the court limited its assessment of alleged events to whether they fell within the scope of the stipulated judgment's invalid future-contingencies provisions.

Thus, the court held mother's "claimed reduction in income is not a change in circumstances that would support modification of the child support order because the existing child support order includes provisions that anticipate and address such fluctuations in petitioner's income." As for mother's claim of increased childcare costs, the court stated, "The existing child support order includes a provision for payments in support of child care in the event that petitioner is unemployed, which is the circumstance in which petitioner currently finds herself regardless of the circumstances of her unemployment. There is not a change in circumstances that would support a change in the child support order simply because this already-anticipated need emerged; consequently, there is no basis upon which this court can change the existing orders in the parties' Judgment."

Given mother's asserted loss of income and need for additional childcare to allow her to search for a new job, as well as other factors argued, such as the impact of the Covid-19 pandemic, we conclude mother was prejudiced by the court's

26

adoption of the future contingency provisions of the stipulated judgment and its failure to conduct an independent review of the conditions and circumstances that existed at the time of the hearing.

## B.    Attorneys' Fees

"[A]ccess to the family law courts through adequate representation is critical.  [Citations.]  Judicial access is particularly vital where child support issues are concerned.  [Citation.]" (*Cheriton, supra*, 92 Cal.App.4th at p. 318.)  Thus, when there is a disparity between the parties' respective financial positions, the Family Code requires courts to order need-based fee shifting to achieve parity between them.  (§ 7605, subds. (a), (b); *N.S. v. D.M.* (2018) 21 Cal.App.5th 1040, 1053 (*N.S.*).)  " 'The idea is that both sides should have the opportunity to retain counsel, not just (as is usually the case) only the party with greater financial strength.'  [Citation.]" (*Ibid*.)

From the outset of this case, mother sought need-based attorneys' fees from the trial court, arguing that she lacked the financial resources to hire and keep lawyers.  The court did not rule on mother's request for 18 months.[12]  When it ultimately reached the issue, the court held that mother was entitled to

---

[12] Although mother asserts that this lengthy delay was error, she has forfeited her appellate challenge to the timing— rather than the amount— of the court's fee award by failing to support her claim with reasoned legal argument and based on authority.  (Cal. Rules of Court, rule 8.204(a)(1)(B); see *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [failure to develop claim with reasoned legal argument and supporting authority forfeits the issue].)

27

need-based fees under section 7605. Although it calculated that mother had generated $145,413.50 in attorneys' fees and costs, it awarded her only $4,720.50.[13] The award covered a portion of the work performed by attorney Karney, who initiated the request for order. The court did not award any fees for work performed by attorney Atighechi, who conducted discovery and drafted the reply brief. Nor did the court award any fees for work performed by attorney Blum, who represented mother for the remainder of the case.

Mother contends these choices were an abuse of discretion. We conclude that the court should have awarded mother additional need-based fees to pay for work performed by Karney and Blum, but that the court acted within its discretion in declining to award fees to Atighechi.

### 1. Legal Principles and Standard of Review

In child custody matters, courts must "ensure that each party has access to legal representation" by, where necessary, ordering "one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (§ 7605, subd. (a).) When a party requests attorneys' fees and costs under section 7605, "the court shall make findings on whether an award of attorney's fees and costs is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the

_____

[13] Father had generated $491,511 in attorneys' fees during the same period.

28

findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." (*Id.*, subd. (b).)  Thus, "the court must first assess whether a fee award is necessary to ensure access to legal representation and then, based on that assessment, award that amount which is reasonably necessary to ensure 'each party has access to legal representation.'" (*Kevin Q. v. Lauren W.* (2011) 195 Cal.App.4th 633, 642.)

"'The "burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable.  [Citation.]"'" (*Gonzalez v. Santa Clara Department of Social Services* (2017) 9 Cal.App.5th 162, 169 (*Gonzalez*).)  Our "review of the amount of attorney fees awarded is deferential.  [Citation.]  Because the 'experienced trial judge is the best judge of the value of professional services rendered in his [or her] court,' we will not disturb the trial court's decision unless convinced that it is clearly wrong, meaning that it is an abuse of discretion.  [Citations.]" (*In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1051–1052.)

"The abuse of discretion standard is 'deferential,' but it 'is not empty.'" (*Gonzalez, supra*, 9 Cal.App.5th at p. 169.)  The " 'scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action … ."  Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25.)  As relevant here, a "'trial court's award of attorney fees must be able to be rationalized to be affirmed on appeal.  . . .  When a trial court makes an award that is inscrutable to the parties involved in the case, and there is no apparent reasonable basis for the

29

award in the record, the award itself is evidence that it resulted from an arbitrary determination." (*Roe v. Halbig* (2018) 29 Cal.App.5th 286, 312–313.)

### 2. Attorney Karney

On August 12, 2019, attorney Karney filed mother's request to modify child support and a request for need-based attorneys' fees and costs. He indicated that as of July 31, 2019, mother had incurred $4,720.50 in fees and costs, and he anticipated billing an additional $10,000 in the case. Therefore, Karney asked the court to award mother a total of $15,000.

When the court decided the request in March 2021, however, the court awarded mother only $4,720.50 for Karney's work—the amount incurred as of July 31, 2019. As discussed below, the court did not provide any explanation for its decision not to award any fees for Karney's work between August 1, 2019, the first day of the next billing cycle, and December 11, 2019, when he substituted out as attorney of record.

First, the court agreed that it was required to award mother need-based fees under section 7605. It noted that "a disparity exists in ability to pay for, and access to funds to retain, counsel." In particular, mother was "a working mother who is solely responsible for caring for the parties' child. [Father] earns more than double petitioner's income and has other assets in addition to his income." After reviewing father's financial circumstances, the court concluded father had "sufficient assets to pay both parties' attorneys' fees."

Next, the court observed that "Mr. Karney has over 26 years of experience in family law, is a Certified Family Law Specialist, and has a great deal of practical experience in cases like the present matter. Mr. Karney's hourly rate of $450 is

30

reasonable." The court did not express any reservations about Karney's hourly rate, the quality of his work, or his billing records.

The court failed to give any explanation for why it limited its fee award to work performed before August 1, 2019. The evidence shows that Karney generated almost half of the anticipated fees soon after mother's request for order and fee request were filed on August 12, 2019. Billing records indicate that mother incurred an additional $4,397.50 for a total of $9,118 in fees and costs between August 1 and August 14, 2019. The record does not indicate how much Karney generated in fees and costs between August 14, 2019, and December 11, 2019, when he substituted out as mother's attorney. At minimum, however, Karney would have had to review father's 220-page responsive declaration filed on September 24, 2019, prepare for the October 7, 2019 hearing, and attend the hearing. In short, the court had ample information about the work Karney performed.[14]

Based on the record before us, we are unable to discern a reasonable basis for the court's choice to limit the fee award for Karney's work to fees incurred as of July 31, 2019 is not supported by the evidence in the record. Accordingly, we conclude the court abused its discretion. (*Roe v. Halbig*, *supra*, 29 Cal.App.5th at pp. 312–313.)

---

[14] As we discuss in detail in section 2.4, *post*, even without billing records, courts may rely on their own experience and knowledge in determining the reasonable value of an attorney's services. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 316.)

31

### 3.     Attorney Atighechi

On December 11, 2019, Karney substituted out as mother's attorney of record, and attorney Atighechi substituted in. Atighechi was responsible for the discovery phase of the case. Based on the court's finding that Atighechi over-litigated and abused the discovery process, the court denied mother's request for Atighechi's fees in its entirety.

The court acknowledged that one claim in the case, "that respondent is wrongfully diverting his income by paying excessive sums to his wife for her professional services, [was] a complicated claim that required significant discovery." Nevertheless, it concluded that "the amount of work the attorneys expended in this litigation was not reasonable." Specifically, the court agreed with father that the modification request was ready to be heard on October 7, 2019, but had to be continued because mother requested a CART reporter on the day of the hearing, and no CART reporter was available on such short notice. Following the continuance and Karney's departure from the case, Atighechi "propounded multiple discovery requests, causing both parties substantial attorney fees and result[ing] in significant sanctions ordered against petitioner and Ms. Atighechi." Because mother "over-litigated this case," and in light of "the many difficulties petitioner had during the phase of the case with Ms. Atighechi," the court did not find any of Atighechi's fees reasonable.

Atighechi's discovery conduct was a proper consideration. Financial resources, though important, are not the only factor the court may consider when making a need-based fee award. (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 975.) "The trial court may also consider the other party's trial tactics.

32

[Citations.]"  (*Ibid.*; *In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1314.)  Here, the court concluded that the majority of Atighechi's fees were not incurred litigating necessary issues or in a reasonable manner and, in many instances, were incurred in a way that increased the fees for both parties.  The court reasoned that requiring father to pay mother's fees under those circumstances would be unjust.  (See *Darab Cody N. v. Olivera* (2019) 31 Cal.App.5th 1134, 1142–1145 [party's tactics in child custody dispute were relevant to evaluate the relative need-based fees between the parties and supported the trial court's decision to deny such]; *In re Marriage of Turkanis & Price* (2013) 213 Cal.App.4th 332, 356 [" 'services which have no apparent effect other than to prolong and to complicate domestic litigation cannot be deemed "reasonably necessary" [citation] "to properly litigate the controversy"'"].)

We conclude mother has not established that the court abused its discretion in declining to award fees for Atighechi's work.  The discovery process in this case was contentious and protracted.  Between them, the parties filed ten discovery motions—three motions to quash, six motions to compel, and one motion for a protective order.  Father prevailed on all ten.  The discovery referee recommended that the court impose $14,000 in sanctions on mother and her lawyer, with $11,000 to be paid by Atighechi either personally or jointly and severally.  Although some of Atighechi's work—such as responding to father's discovery demands and drafting the reply brief to the modification request—appears to have been necessary, when that work is balanced against the extensive fees father incurred to counter Atighechi's problematic discovery tactics, we cannot find

33

that the court's ruling denying Atighechi's fees constituted an abuse of its discretion.

### 4. Attorney Blum

Atighechi substituted out as counsel of record on April 13, 2020. On June 10, 2020, mother, acting in propria persona, filed an ex parte application for need-based attorney's fees. On her income and expense declaration, mother stated that she had incurred $81,801 in attorneys' fees to date, of which she had paid $53,000 by charging the fees to at least five different credit cards. She asked the court to order father to pay all of those fees plus an additional $10,000 in pendente lite fees to allow her to retain and pay counsel going forward.[15]

On August 5, 2020, after four months in which mother represented herself, attorney Blum substituted in as mother's attorney of record. In her time as mother's attorney, Blum and her colleagues attempted to negotiate a settlement agreement, filed several concluding briefs, attended the September 1, 2020 hearing on the modification request, and prepared the filings needed to bring the matter to a close. Blum detailed the cost of some—but not all—of that work in a declaration filed on August 25, 2020, in support of mother's fee request.[16]

---

[15] Although the court later granted father's motion to strike mother's memorandum and supporting declaration because they violated the court's typography requirements, it did not strike either the application itself or the supporting exhibits.

[16] Specifically, Blum declared that mother had incurred $23,425 in connection with three filings: (1) ex parte request for leave to file a sur-reply in support of the request to modify child support, (2) sur-reply in support of the request to modify child

34

The court declined to award any attorneys' fees for Blum's work. It held that the work performed between the original hearing date of October 7, 2019, which was continued for lack of a CART reporter, and the ultimate hearing date of September 1, 2020, "added nothing valuable to petitioner's case." As such, it found that the attorneys' fees generated for that work were not reasonably necessary. The court also declined to award any fees for time spent appearing at the September 1, 2020 hearing itself or preparing the post-hearing filings the court had ordered because Blum had provided insufficient billing records. We conclude both rulings were an abuse of discretion.

First, the court held that most of Blum's work was unnecessary because the matter was ready for hearing on October 7, 2019, and "none of the subsequent work added any support to petitioner's claims." It also noted that "petitioner spent more than $80,000 in attorney's fees before hiring Ms. Blum," and "[d]espite Ms. Blum's extensive efforts, petitioner never found a firm ground for her various claims . . . ." In particular, the court declined to order fees for the time Blum spent preparing and following up on a settlement proposal because it "brought no apparent beneficial result." The court did not address any other pre-hearing filings prepared by Blum's office.

---

support, and (3) reply to request for need-based attorneys' fees. Taken together, those filings required 35 hours of associate time (at $305 per hour) and 15 hours of Blum's time (at $850 per hour). In addition, Blum spent 4.25 hours (for a total of $3,612.50) preparing and attempting to negotiate a settlement proposal and expected to spend 30 to 40 hours (up to $34,000) preparing for and attending the hearing on the matter.

The court's conclusion that the matter could have been decided in October 2019 rested on the assumption that the stipulated judgment restricted the court's ability to make findings about the parties' current incomes and expenses. As we have explained, however, the agreement's future-contingency provisions are invalid. Thus, the court was required to ascertain the parties' current incomes and expenses, which, in father's case, would have rested in part on the validity of the 35 percent commission paid to his wife. The court acknowledged that was a "complicated" issue "that required significant discovery." Indeed, it was only through discovery conducted *after* the October 2019 hearing was continued that mother first learned about the commission.[17]

Second, the court held that although Blum had filed documents that were needed to bring the case to a close, she had not provided "information about the amount of time spent in connection with any of this work, and the court declines to

---

[17] Father's initial responsive filing noted that his current income included "a portion of an advance on royalties (less agent commissions)" from the new publishing contract but did not reveal the amount of the commission. Although father attached the first page of the publishing contract to his supporting declaration, neither the declaration nor the single page of the contract referred to the 35 percent commission. Indeed, the commission is not mentioned anywhere in the record until December 24, 2019, in connection with a motion to compel. And it appears father did not disclose until January 2, 2020 that his publisher pays the 35 percent commission to his wife directly before paying him the remaining 65 percent.

speculate on the amount of attorney fees charged or paid for it."[18] We conclude the court abused its discretion by declining to award any fees for this work based on a failure of proof.

Again, *Cheriton* is instructive. (*Cheriton*, *supra*, 92 Cal.App.4th at pp. 315–318.) In that case, as in this one, the wife requested need-based attorneys' fees. On the day of trial, the wife's attorney submitted a declaration that "failed to show 'the amount of fees incurred, the costs, the time expended, or even the hourly rates of counsel.'" (*Id.* at p. 315.) In response, the trial court denied the request for need-based fees based on a "'significant absence of proof on the issues.'" (*Ibid.*)

The *Cheriton* court stated that in child support matters, the trial court has "a duty to make a just and reasonable award of attorneys' fees and costs, if warranted under the circumstances of the case before it." (*Cheriton*, *supra*, 92 Cal.App.4th at p. 318.) Those circumstances include mother's need for representation and father's ability to pay her attorneys' fees. (*Ibid.*) The court below "considered the relevant circumstances . . . . But its decision [to deny fees] clearly was based on its determination that [the moving party] had failed to carry her burden of proof." (*Ibid.*) The lower court "abused its discretion" by deciding the matter based on evidentiary failings, and "refusing to consider the fee request on its merits." (*Ibid.*)

---

[18] Specifically, the court noted that Blum did not account for the time she spent attending the hearing on the modification request or preparing mother's reply declaration concerning attorneys' fees, the written closing argument requested by the court, the compendium of documents requested by the court, and objections to the tentative statement of decision.

37

The same is true here. Although Blum did not detail the time she spent bringing the case to a close, this was work the court acknowledged "arguably, could be reasonably necessary . . . ." The court, having overseen the case from its inception, had sufficient information to evaluate the request.[19] Because it was necessarily aware of the extent and nature of the services Blum had rendered, the court could have relied on its own experience and knowledge in determining their reasonable value. (*Cheriton*, *supra*, 92 Cal.App.4th at p. 316, quoting 2 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2001) Attorney's Fee Awards, § 62.05[3][a], pp. 62-32.2 to 62-32.3.) Alternatively, if the court felt it lacked sufficient information to make this calculation itself, it could have reopened evidence to seek more detailed records. (*Cheriton*, at pp. 317–318.) Either way, refusing to award mother *any* need-based fees for reasonably necessary work because it found Blum's declaration lacking in detail was an abuse of discretion. (*Id.* at p. 318.)

## C. Discovery Sanctions

The court imposed $27,600 in discovery sanctions on mother to compensate father for attorneys' fees and costs

---

[19] For example, the court stressed that Blum had "attended the court hearing on September 1, 2020, but petitioner provided no information about the amount of time charged or paid for this appearance." Thus, the court "deni[ed] petitioner's request to have respondent pay for the undefined amount of time Ms. Blum spent appearing on September 1, 2020." The court personally conducted that hearing, however. It knew both Blum's hourly billing rate, which it found was not excessive, and the length of the hearing. Therefore, it could have calculated at least some of the fees incurred for that appearance.

38

associated with various discovery disputes.[20]  Mother challenges three of these awards: $11,095 relating to father's motions to quash subpoenas to Citibank and Marcum LLP (Marcum); $6,415 relating to father's motion to compel compliance with his second set of inspection demands; and $7,090 relating to father's motion to compel further responses to his second set of inspection demands.[21]

We conclude the court abused its discretion by sanctioning mother for opposing the motions to quash because any sanctions for opposing those motions should have been imposed on mother's attorney.  As to the sanctions for opposing the two motions to compel, we conclude the court acted within its discretion by sanctioning mother, but it made a legal error, and, therefore, abused its discretion, when it double-counted the time father's counsel spent arguing the motions.

---

[20]  On appeal, mother challenges only the $24,600 in sanctions the court imposed in its March 19, 2022 order.  She does not challenge the $3,000 in sanctions the court imposed on her in its March 13, 2020 minute order—$1,500 for opposing father's motion to compel further responses to a second set of special interrogatories and $1,500 for opposing father's motion to compel further responses to a second set of requests for admission.  Nor do we address the $1,500 in sanctions the court imposed on mother's attorney for bringing an unsuccessful motion to compel further responses to a second set of family law form interrogatories.

[21]  We refer to the latter two motions, respectively, as the motion to compel compliance and the motion to compel further responses.

39

### 1.    Standard of Review

"We review an order imposing discovery sanctions under the abuse of discretion standard.  [Citation.]  An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice.  [Citations.]  The abuse of discretion standard affords considerable deference to the trial court, provided that the court acted in accordance with the governing rules of law." (*New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422.)  "We recognize that our review of the trial court's sanctions award is deferential, but we must ensure the trial court has followed the applicable statute." (*Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 76.)  "A decision 'that transgresses the confines of the applicable principles of law is outside the scope of discretion' and is an abuse of discretion.  [Citation.]"  (*New Albertsons*, *supra*, at p. 1422.)

"[W]e may affirm the court's sanctions order on any ground supported by the record.  [Citations.]" (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225.)  We review any factual findings that formed the basis of the sanctions award for substantial evidence.  (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40.)

### 2.    Motions to Quash

Mother contends the $11,095 in sanctions imposed on her for opposing father's two motions to quash exceeded the court's jurisdiction because the notices of motion were procedurally defective and, in any event, the sanctions were an abuse of discretion.  She argues that the court abused its discretion by

40

refusing to adopt the discovery referee's recommendation that it impose sanctions of $1,500 per motion ($3,000 total) on mother's attorney rather than mother herself, and the amount of sanctions awarded exceeded the total fees and costs for these motions requested in father's papers. We reject mother's jurisdictional argument but agree with her that the court abused its discretion by imposing sanctions on her rather than on counsel. Because counsel lacked constitutionally adequate notice, however, we reverse this portion of the sanctions order.

### a. Proceedings Below

Discovery in this matter opened on October 7, 2019. On December 19, 2019, mother's attorney issued a subpoena to Citibank for all documents in its possession relating to father. The same day, counsel issued a subpoena to Marcum for father's complete, unredacted tax returns for the previous three years.

On December 23, 2019, father's attorney sent two letters to mother's attorney asserting various defects in the subpoenas. However, since the Citibank subpoena had set a compliance date of January 10, 2020, and the Marcum subpoena had set a compliance date of January 17, 2020, discovery could not be completed before the discovery deadline.[22] (See Code Civ. Proc., § 2024.010 ["discovery is considered completed on the day a response is due"].)[23] Father's counsel also argued that father had

---

[22] The discovery cut-off was actually January 6, 2020. Regardless, the motions to quash cited the correct date, and each subpoena still set a compliance date beyond the deadline.

[23] Undesignated statutory references in section 3 of the discussion are to the Code of Civil Procedure.

already produced the documents mother was attempting to obtain with the Citibank subpoena, and the parties were still meeting and conferring about the tax returns demanded by the Marcum subpoena. She therefore asked mother's attorney to withdraw the subpoenas.

Mother's attorney neither responded to the claims of procedural defects–nor withdrew the subpoenas. After father's counsel raised the issue of the defective Citibank subpoena again, and again tried, unsuccessfully, to get mother's attorney to withdraw it, father moved to quash both subpoenas. Counsel for mother filed an omnibus opposition that addressed mother's need for the documents but did not address the deadline issue.

After a hearing, the discovery referee recommended that the court award father $1,500 in sanctions for each subpoena ($3,000 total) against counsel only. Mother's attorney objected to these recommendations, both in person at the hearing and, later, in writing, contending she had not received notice that she could be sanctioned. She also argued that mother could not be sanctioned in her place: "At the hearing, sanctions [were] heard only against counsel[,] who raised lack of notice that went completely ignored. This court cannot sanction [mother] to compensate for the lack of notice against counsel as the issue of sanctions against [mother] for the Motion[s] to Quash was not raised at the hearing."

In a minute order dated March 13, 2020, the trial court concluded that mother's attorney had not received adequate notice that father sought sanctions against her personally. It therefore rejected the discovery referee's recommendation that it impose sanctions on counsel but reserved ruling on whether to sanction mother.

42

The parties did not substantively address discovery sanctions at the final hearing on September 1, 2020.[24] Nor did they address them in detail in their written closing arguments. However, mother's attorney urged the court not to impose sanctions because mother lacked the ability to pay them. Father's attorney asked the court to impose the full $32,160 requested in the six outstanding sanctions motions against mother. That total included $15,610 for the motions to quash.[25]

The court imposed sanctions of $11,095 on mother alone.[26] The court held: "The court finds that petitioner opposed both

---

[24] By that point, mother was represented by a different attorney.

[25] Father originally requested $16,820 in sanctions for three motions to quash: $6,615 for Citibank, $5,690 for Marcum, and $4,515 for a Morgan Stanley subpoena that was later withdrawn. Each request included $1,050 in anticipated fees to prepare a reply brief, for a total of $3,150 across the three motions. Because father filed an omnibus reply, however, he incurred only $1,840 in reply brief fees for the three motions. As such, father reduced his fee request by $1,310 ($3,150 anticipated − $1,840 actual). Although the adjusted total for the three motions should have been $15,510 rather than $15,610, the higher number appears to be a typographical error.

[26] As noted, father had filed a motion to quash a subpoena to Morgan Stanley, which contained its own request for $4,515 in sanctions. Because mother withdrew the subpoena and did not oppose the motion, no sanctions were ultimately imposed for it. Thus, it appears the court arrived at the $11,095 total by subtracting the originally-requested $4,515 in Morgan Stanley sanctions from father's adjusted total request of $15,610 in sanctions for the three motions to quash.

motions without substantial justification and failed to withdraw the subpoenas even after being advised repeatedly that they were fatally flawed.  Petitioner's unreasonable actions caused respondent to incur at least $11,095, which the court finds is a reasonable amount of attorneys' fees for the work described in the attorney's declaration attached to respondent's filings.  The court finds that monetary sanctions are warranted and just, despite petitioner's financial position relative to respondent's, and hereby ORDERS petitioner to pay respondent $11,095 for these two motions.  [Citation.]"

### b. The sanctions notices for the motions to quash were not procedurally defective as to mother.

Father filed two motions to quash and requests for sanctions, each with a supporting memorandum of points and authorities.  Each notice of motion utilized Judicial Council Form FL-300 (Request for Order).  In the "Notice of Hearing" section, notice was directed "To Petitioner [Mother] and her Attorney of Record."  The Request for Order section requested monetary sanctions but did not identify a target of the sanctions.  Mother contends the notices of motion were procedurally defective because they failed to identify her as a person "against whom the sanctions are sought" under section 2023.040.  Thus, she argues, the court's sanctions award exceeded its jurisdiction.  We disagree.

Although section 2023.040 sets forth the procedural requirements for sanctions motions brought under section 2023.010, father did not move for sanctions under section 2023.010.  Instead, he sought sanctions under section 1987.2, subdivision (a), which authorizes sanctions in

44

connection with successful motions to quash brought under section 1987.1.  (See *City of Los Angeles v. Superior Court* (2003) 111 Cal.App.4th 883, 888 [procedural remedy for a defective subpoena is generally a motion to quash under § 1987.1].)  Section 1987.2 does not contain particularized procedural requirements.[27]  (*First City Properties, Inc. v. MacAdam* (1996) 49 Cal.App.4th 507, 514–516.)  Thus, sanctions imposed under section 1987.2 must comport only with general principles of due process.  (*Id.* at p. 515; *In re Marriage of Fuller* (1985) 163 Cal.App.3d 1070, 1077 [notice prior to imposition of sanctions required by the due process clauses of both state and federal constitutions].)

"Due process mandates adequate notice and opportunity to be heard prior to the imposition of sanctions.  [Citation.]" (*Barrientos v. City of Los Angeles* (1994) 30 Cal.App.4th 63, 70.) "The purpose of the notice requirement 'is to cause the moving party to "sufficiently define the issues for the information and attention of the adverse party and the court.'" [Citations.]" (*Kinda v. Carpenter* (2016) 247 Cal.App.4th 1268, 1277.)  Even where a notice contains an omission, this purpose may be met where the supporting papers provide the information that was omitted from the notice.  (*Luri v. Greenwald* (2003) 107

---

[27]  That statute provides that in "making an order pursuant to motion made . . . under Section 1987.1, the court may in its discretion award the amount of the reasonable expenses incurred in making or opposing the motion, including reasonable attorney's fees, if the court finds the motion was made or opposed in bad faith or without substantial justification or that one or more of the requirements of the subpoena was oppressive." (§ 1987.2, subd. (a).)

Cal.App.4th 1119, 1125 ["An omission in the notice [of motion] may be overlooked if the supporting papers make clear the grounds for the relief sought"].) "That 'notice must be given *before* findings are made and at a time preceding the trial judge's decision whether, in fact, to impose sanctions.' [Citation.] '[The] adequacy of notice should be determined on a case-by-case basis to satisfy basic due process requirements. . . .' [Citation.]" (*Barrientos*, *supra*, at p. 70.)

Here, mother does not contend that she lacked constitutionally adequate notice or suffered prejudice from father's failure to highlight her as the target of the proposed sanctions in his notices of motion. To the contrary, while the notices of motion did not explicitly identify mother as a sanctions target, the points and authorities supporting each motion to quash did: They stated that "[m]onetary sanctions against [mother] are warranted here"; "[mother] should be sanctioned"; and "the Court should award monetary sanctions against [mother]." Because mother does not explain how including her by name in the notices of motion as well as in the memoranda of points and authorities might have altered her response or impacted the outcome, we conclude the court's sanctions order did not violate either the state or federal due process principles.

### c. The court abused its discretion by sanctioning mother in lieu of her attorney.

Although mother received adequate notice that she could be sanctioned, the court nonetheless abused its discretion in finding her responsible for the legal defects in the subpoenas. The parties recognized below that whether the subpoenas were fatally defective because they set the document production deadline for after the close of discovery was a purely legal question that

mother should not have been expected to determine. Counsel—not mother—miscalculated the deadline. Counsel—not mother—refused to withdraw the subpoenas when the defect was brought to her attention. Notwithstanding father naming mother, rather than her attorney, as the target of sanctions in his moving papers, at the discovery hearing, he sought sanctions only against counsel. Father's attorney explained: "As to the motions to quash, I think that's counsel's responsibility; so I think those [sanctions] should be ascribed to counsel."

When mother's lawyer objected that she had not received notice that she was a sanctions target and asked the discovery referee to impose sanctions on her client instead, father's attorney intervened: "This was clearly a motion filed after discovery cutoff. As much as I would like for the petitioner to learn her lesson—and there are certain requests in here where I do think it's proper for the petitioner to learn her lesson—on this one it was counsel's responsibility to explain to her, look, the deadline's been missed; we shouldn't file this; we missed our window to enforce. This is something exclusively in the control of counsel." After further discussion, father's attorney concluded: "There is no question that these were subpoenas that were untimely, period, end of story. Any responsible counsel would have not pressed on them, and so we were forced to quash them, period." Judge Goetz agreed and recommended that the court impose $3,000 solely against counsel for opposing the two motions.

Notwithstanding that recommendation, the trial court was correct that, as a due process matter, it could not sanction counsel because father had not provided her with adequate notice. (See *Blumenthal v. Superior Court* (1980) 103 Cal.App.3d

47

317 [sanctions against attorney reversed based on lack of notice where moving papers sought sanctions only against client].) Counsel objected repeatedly on that basis, both at the discovery hearing and in written responses to the referee's report. Nevertheless, the court's inability to impose sanctions on the attorney responsible for the discovery abuses did not justify the imposition of sanctions on her client instead. We therefore conclude the court abused its discretion by imposing $11,095 in sanctions against mother for the motions to quash.

### 3. Motions to Compel

Father brought two motions to compel in connection with his second set of inspection demands. His motion to compel further responses sought various medical records that mother had, for privacy reasons, refused to produce. His motion to compel compliance sought documents mother had agreed to produce but had not actually provided. Mother argues that the court abused its discretion by sanctioning her for opposing the motion to compel further responses because she was substantially justified in seeking to withhold medical records relating to her gynecological history. As to both motions to compel, mother argues that the sanctions should have been imposed on her attorney rather than on her and that the combined sanctions award was excessive because the court double-counted the time father's attorney spent at the discovery hearing.

We conclude mother has not established that her opposition was substantially justified or that the court should have sanctioned mother's lawyer instead of mother. Accordingly, the sanctions awards were within the court's discretion. We agree with mother, however, that the court double-counted the time

48

father's lawyer spent at the consolidated discovery hearing. Accordingly, we order the court to reduce the total sanctions award by $1,750.

### a.     Proceedings Below

Father's motion to compel further responses challenged mother's attempt to shield various medical records from discovery, including records relating to her pregnancies, miscarriages, and treatments for ovarian cancer. Father sought an order compelling production of the disputed documents and awarding him $7,090 in sanctions. Mother filed a consolidated opposition to both motions to compel. As to the motion to compel further responses, she argued that her medical records were protected private information, that the records were irrelevant to the issue of child support, and that father's attorneys had not complied with meet and confer requirements.

The discovery referee recommended that the court grant the motion to compel further responses. As relevant here, although mother had objected on privacy grounds, she did not invoke the doctor–patient privilege explicitly, as required by statute. Likewise, the cases mother cited for the proposition that father was required to demonstrate a compelling need for the information had all been overruled. Finally, the requested discovery was directly relevant to mother's credibility. The referee recommended that the court impose $2,500 in sanctions to be paid jointly and severally by mother and her attorney for opposing the motion. Ultimately, the court imposed $7,090 on mother alone.[28]

---

[28]     The court's order states: "The court finds that petitioner opposed this motion without substantial justification,

In the motion to compel compliance with inspection demands, father argued that mother had agreed to produce various documents in whole or in part, but had either failed to so or had provided incomplete responses. He sought an order compelling production of the documents and awarding $6,415 in sanctions.

Although mother purported to file a consolidated opposition to the two motions to compel, her opposition did not address any specific demand made in the motion to compel compliance with inspection demands. At the discovery hearing, mother's attorney argued that mother had intended to produce the documents, but because the meet and confer conference was not held until the day before the production deadline, mother did not have sufficient time to gather them. She did not explain why mother still had not produced them.

The discovery referee recommended that the court grant the motion. The referee reasoned that mother had failed to turn over documents that she had agreed to produce, had not provided

---

failed to comply with the inspection demands, interposed unmeritorious objections, provided incomplete and evasive answers, failed to provide code compliant responses, and failed to meaningfully meet and confer to resolve the issues. Petitioner's unreasonable actions caused respondent to incur at least $7,090, which the court finds is a reasonable amount of attorneys' fees for the work described in the attorney's declaration attached to respondent's filings. The court finds that monetary sanctions are warranted and just, despite petitioner's financial position relative to respondent's, and hereby ORDERS petitioner to pay respondent $7,090 for her actions in connection with these two motions. (CCP § 2031.310(h).)" Although the court referred to "two motions," only one motion was at issue.

50

specific reasons that she could not comply with some demands, and had provided "evasive, inadequate, or incomplete" answers to other demands. The discovery referee recommended that the court award $2,500 in sanctions to be paid jointly and severally by mother and her attorney. Ultimately, the court imposed $6,415 in sanctions on mother alone.[29]

### b. Mother was not substantially justified in opposing the motion to compel further responses.

Section 2031.310, subdivision (h), provides: "the court shall impose a monetary sanction . . . against any party, person, or attorney who unsuccessfully makes or opposes a motion to compel further response to a demand, unless it finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust."

---

[29] The court's order states: "The court finds that petitioner opposed this motion without substantial justification, failed to produce documents that she promised to and/or produced incomplete responsive documents, and/or produced responses that were not code compliant since she failed to include all required information. (See, e.g. CCP § 2031.230.) Petitioner's unreasonable actions caused respondent to incur at least $6,415, which the court finds is a reasonable amount of attorneys' fees for the work described in the attorney's declaration attached to respondent's filings. The court finds that monetary sanctions are warranted and just, despite petitioner's financial position relative to respondent's, and hereby ORDERS petitioner to pay respondent $6,415 for her actions in connection with these two motions. (CCP § 2031.310 (h).)" Although the order referred to "two motions," only one motion was at issue.

Mother contends the court abused its discretion by sanctioning her for opposing father's motion to compel further responses. She argues that although she "lost on the merits of her objections, her efforts to protect her sensitive personal information and to seek the court's determination of whether her privacy interests outweighed [father's] need for discovery were substantially justified and objectively reasonable." We disagree.

"In the absence of contrary court order, a civil litigant's right to discovery is broad. '[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action . . . if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence.' (§ 2017.010; see *Davies v. Superior Court* (1984) 36 Cal.3d 291, 301 ["discovery is not limited to admissible evidence"].) Section 2017.010 and other statutes governing discovery 'must be construed liberally in favor of disclosure unless the request is clearly improper by virtue of well-established causes for denial.' [Citation.] This means that 'disclosure is a matter of right unless statutory or public policy considerations clearly prohibit it.' [Citation.]" (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 541 (*Williams*), fn. omitted.) Information about a witness's credibility is relevant and discoverable. (See Evid. Code, § 710, subd. (e).)

Mother's argument to the contrary rests on her assertion that in opposing the motion to compel, she "sought in good faith the trial court's adjudication of the privacy factors set forth in *Williams v. Superior Court*[, *supra*,] 3 Cal.5th 531." The record does not support this claim.

To be sure, the crux of mother's opposition below was that "many of the demands at issue request information pertaining to"

52

mother's medical history. This information, she argued, was protected from disclosure by the California Constitution and the Evidence Code. Mother failed to cite any valid authority in support of her arguments, however. For example, mother argued that "[r]elevance, much less the 'reasonably calculated' argument, is not the standard when privacy rights are at issue." She went on to quote: "'It is not enough that the private medical information may lead to relevant evidence.' (*Binder v. Superior Court* (1978) 20 Cal.3d 844, 862–864.)"

Neither the cited case name nor the quoted sentence appear in that volume of the California Reports—and the case that *does* appear at 20 Cal.3d 844 does not stand for the asserted proposition. *Britt v. Superior Court* involved personal injury plaintiffs who had been ordered to disclose their entire lifetime medical histories, including their psychiatric records. (*Britt v. Superior Court* (1978) 20 Cal.3d 844.) The Supreme Court held that although the plaintiffs could "not withhold information which relates to any physical or mental condition which they have put in issue by bringing this lawsuit," they were "entitled to retain the confidentiality of all unrelated medical or psychotherapeutic treatment they may have undergone in the past." (*Id.* at p. 864)

To the extent mother's error stemmed from the citation rather than the case name, she may have intended to cite *Binder v. Superior Court* (1987) 196 Cal.App.3d 893. Indeed, language similar to that quoted in mother's brief does appear in *Binder*—but *Binder* was overruled six years ago by *Williams*, *supra*, 3 Cal.5th at p. 557, fn. 8, the case under which she now claims to have objected, but did not mention below. Even on appeal, however, mother does not analyze the *Williams* factors—or list

53

them, or even point to the page on which they might be found—despite *Williams* being the only case cited in this section of her opening brief.

Based on the record before us, father claimed mother had lied about various medical issues, and he sought records substantiating or contradicting her claims. Mother did not timely object that the information father sought was privileged or provide any coherent legal argument to support non-disclosure. On this record, because the information was potentially relevant to mother's credibility and mother has not provided any relevant legal justification for her position, we conclude mother has not established that she was substantially justified in opposing father's motion to compel.

### c.    The court did not abuse its discretion by sanctioning mother personally.

Mother next contends that the court's sanctions orders for the two motions to compel rested on the erroneous belief that father was seeking sanctions against mother personally, rather than jointly against mother and her lawyer. Because any misconduct was counsel's fault, she argues, the court abused its discretion by sanctioning her alone. We disagree.

When father filed his motion to compel further responses, he sought sanctions against mother "and/or" her attorney. At the discovery hearing, he requested joint and several sanctions. Counsel argued: "On [the motion to compel further responses], I'm kind of on the fence about the sanctions. I think it's a little bit of both counsel and the client. I ask for joint and several on this one." By the time he filed his written closing argument, however, father had narrowed his requested sanctions target to mother only.

54

Father's motion to compel compliance with inspection demands initially sought joint and several sanctions as well. At the discovery hearing, however, he sought sanctions against mother personally. Counsel argued: "[Mother] could have produced the documents at any point between then and now to obviate today's hearing. This is something where I think sanctions should be imposed against the party, not counsel." Father's written closing argument maintained this position, seeking sanctions solely against mother—not counsel.

Thus, although father initially sought joint and several sanctions against mother and counsel, that position evolved over time. By the time the court decided whether—and against whom—to order sanctions, father was seeking sanctions against mother alone. Accordingly, it was not an abuse of discretion for the court to sanction mother for the discovery abuses.

### d.     The court double-counted the hearing fees.

In his request for sanctions for the motion to compel compliance with inspection demands, father sought $1,750 for his attorney to prepare for, travel to, and appear at the hearing on the motion. He requested fees in the same amount, on the same basis, for the motion to compel further responses. In both motions, counsel acknowledged that hearing fees should be prorated across all of the discovery motions. However, although all ten discovery motions were heard in one proceeding that lasted about an hour, the court awarded father the full $1,750 requested for each motion to compel, for a total of $3,500. Mother contends this was error. We agree. Accordingly, we order the court to reduce the total sanctions award by $1,750.

### DISPOSITION

55

The March 19, 2021 order is reversed as to (1) the court's denial of mother's and father's requests to modify child support; (2) the court's denial of mother's request for additional fees for attorney Karney and its denial of any fees for attorney Blum; and (3) the court's imposition of sanctions on mother for opposing father's motions to quash.

The order is affirmed as to the denial of attorneys' fees for work performed by attorney Atighechi. As to the sanctions imposed on mother for opposing the two motions to compel related to father's second set of inspection demands, the order is affirmed as to the decision to impose the sanctions but reversed as to the amount of the sanctions.

Mother's motion for appellate sanctions, filed July 18, 2022, is denied. Mother is awarded her costs on appeal. The matter is remanded for further proceedings consistent with the views expressed in this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.


We concur:



CURREY,  P.J.



ZUKIN, J.